188 F.3d 709 (7th Cir. 1999)
 Terry Jones, Plaintiff-Appellant,
v.
Lincoln Electric Co., Hobart Brothers Inc., Westinghouse Electric Corp., Airco/The BOC Group, Inc., and Teledyne Industries, Inc., Defendants-Appellees,
and
Dr. Thomas W. Eager, Respondent-Appellee.
 Nos. 96-1376, 97-1938, 98-1487
 United States Court of Appeals, Seventh Circuit
 Argued November 2, 1998
Decided July 29, 1999
Rehearing Denied August 19, 1999
 
 Appeal from the United States District Court for the Northern District of Indiana, Hammond Division. No. 95 C 83--Rudy Lozano, Judge.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Before Cummings,* Bauer, and Kanne, Circuit Judges.
 Kanne, Circuit Judge.
 
 
 1
 We have consolidated for decision three appeals arising from Terry Jones's product liability suit against Hobart Brothers Company, Lincoln Electric Company, Airco/The BOC Group, Westinghouse Electric Corporation, Inco Alloys International, Incorporated, and Teledyne, Incorporated, (collectively, "Defendants"), all of whom are various manufacturers and distributors of welding rods. Jones sought to hold Defendants liable for neurological injuries he allegedly sustained as a result of his exposure to manganese present in fumes emitted from Defendants' welding rods that he used during the course of his employment as a welder. Jones claimed that Defendants were negligent in the manufacture and distribution of the welding rods because they either knew or should have known of the dangers and hazards associated with the breathing of manganese in welding fumes and that Defendants failed to take reasonable precautions against and failed to provide adequate warnings of the potential harm posed by these fumes. Jones also claimed that Defendants' welding rods were unreasonably dangerous, and therefore Defendants were strictly liable for his injuries, because they failed to properly warn him of the risks associated with the use of their rods.
 
 
 2
 Defendants denied that Jones's neurological condition was caused by his exposure to welding rod fumes, maintaining instead that Jones suffered from idiopathic Parkinson's disease--a disease unrelated to manganese overexposure. Defendants also denied the remaining allegations made by Jones. The case was tried to a jury and the jury returned a verdict in favor of Defendants and against Jones on all counts.[1]
 
 
 3
 Jones filed a timely motion for a new trial under Federal Rule of Civil Procedure 59, which the district court denied. Jones then filed his first appeal from the final judgment entered in favor of Defendants. In this first appeal, Jones argues that the district court erred in admitting certain testimony from Dr. Thomas W. Eager, one of Defendants' expert witnesses, and erred in overruling objections to allegedly improper statements made by defense counsel during his closing argument.
 
 
 4
 A little more than eleven months after the jury verdict, and while Jones's first appeal was still pending, Jones filed two additional post-trial motions: a motion for relief from final judgment pursuant to Federal Rule of Civil Procedure 60(b)(2); and a motion for rule to show cause why Dr. Thomas W. Eager should not be held in contempt of court. Both motions were based on "newly discovered" evidence that allegedly showed that Dr. Eager provided false testimony at trial. The district court denied both of these motions. Jones's second and third appeals are from those orders.
 
 
 5
 For the reasons set forth in the following opinion, we affirm the orders and decisions of the district court.
 
 I. History
 
 6
 Terry Jones worked as a journeyman electrician and welder for approximately twenty-eight years, beginning in 1964 and ending in 1992, when his neurological disorder progressed to the point that he could no longer effectively weld. Over the course of his welding career, Jones worked for a number of companies at several different job sites, with most of his work taking place inside large steel mills. Jones estimated that, on average, he spent half of his work day performing electrical tasks and the other half welding.
 
 
 7
 Jones welded using a method commonly known as "arc welding." This process of welding utilizes a consumable steel welding rod connected through a rod holder by a wire to one pole of an electric power supply. Another wire extends from the opposite pole of the power supply to the two pieces of the base metal to be welded together. When the welding rod is brought into contact with the intersection of the two pieces of metal to be joined, the electrical circuit is completed creating an electric "arc" between the tip of the welding rod and the pieces of metal. The electricity flows through the arc producing the very bright light commonly associated with welding and generating tremendous heat sufficient to melt the tip of the steel welding rod. The melting metal from the welding rod drips off the end of the rod and falls into or across the joint to be welded. At the same time, the heat generated by the arc melts some of the base metal of the area of joint as well, forming a pool of liquid steel. As the welder moves the welding rod along the joint, the earlier combination of weld metal and base metal cools and solidifies, leaving a weld.
 
 
 8
 Throughout his welding career, Jones used welding rods manufactured and or distributed by Defendants. The welding rods typically used by Jones were made of mild steel, which consists predominantly of iron, but also contains a small amount of manganese, among other elements and compounds. Manganese is a naturally occurring element and is an essential ingredient to the proper manufacture of steel because it prevents steel from cracking and falling apart when it is manufactured.
 
 
 9
 When the welding process melts both the welding rod and the base metal, the heat of the arc vaporizes a small percentage of the steel and emits "welding fumes." A small amount of the fumes generated by the burning of a mild steel welding rod consists of manganese. Although Jones worked primarily in large steel mills, he welded in a variety of different work environments and in a number of different welding positions that exposed him to varying amounts of welding fumes, with the end result being that he was frequently forced to breathe the fumes, which included manganese, produced by Defendants' welding rods. Although Jones testified that during many of his welding projects a significant amount of welding fumes would tend to accumulate and hover about his head, he indicated that he ordinarily did not take any special precautions to ventilate his work area as he assumed that the ventilation was adequate.
 
 
 10
 Manganese is not only critical to the production of steel, but it is also essential for human life. The human body needs a certain amount of manganese in order to function properly especially in relation to carrying out its chemical functions. Too much manganese within the body, however, can be toxic, causing injury to the brain or the rest of the nervous system and can lead to the onset of a form of Parkinsonism. Parkinsonism is a medical term used to describe a disease typified by a group of signs and symptoms similar to that seen in Parkinson's disease, a neurological disorder that is characterized by the causing of abnormal or slow bodily movements. According to the medical testimony introduced at trial, a person suffering from a form of Parkinsonism will typically exhibit some or all of four general symptoms that are common to Parkinson's disease. The first symptom is a resting tremor, meaning an abnormal shaking movement of a person's body part while the person is at rest. The second symptom is rigidity, meaning a stiffness or resistance to movement in the limbs. When a physician tries to move the patient's arms or legs, the physician can feel a resistance to the movement. The third symptom is called bradykinesia or slowness of movement. A patient will experience slowness or difficulty in carrying out and initiating all kinds of movements. The fourth symptom usually common to Parkinsonism is a difficulty in maintaining one's balance or the loss of postural reflexes.
 
 
 11
 Although there are several different forms or types of Parkinsonism, the two types relevant to this case are idiopathic Parkinson's disease and manganese-induced Parkinsonism or "manganism." Although occasionally described at trial as a type of Parkinsonism, idiopathic Parkinson's disease is basically Parkinson's disease without a known cause. A person suffering from this disease will exhibit most, if not all, of the general Parkinsonian symptoms described above as the disease progresses. Manganism, by contrast, is a medical term used to describe a neurological disease similar to idiopathic Parkinson's disease that is caused by overexposure to manganese. The two are distinct medical conditions with manganism usually marked by the absence of some of the above-mentioned general symptoms and the presence of other "atypical" features normally not found in patients suffering from idiopathic Parkinson's disease. Idiopathic Parkinson's disease afflicts approximately one to two percent of the population over the age of fifty, although some patients begin to develop the disease under fifty years of age. Manganism, on the other hand, is quite rare with only a few documented cases in the United States. Jones believes that he suffers from manganism and that he developed this disease through his exposure to manganese contained in welding fumes given off by Defendants' welding rods.
 
 
 12
 Jones first began to manifest symptoms of a neurological injury in 1987, when, at the age of forty-seven, he noticed that his left hand had begun to shake involuntarily. Soon thereafter, Jones went to see a neurologist, Dr. Young Il Ro, who operated a private medical practice in Chicago Heights, Illinois. Jones specifically complained to Dr. Ro that he was experiencing a tremor and a loss of dexterity in his left hand and that he felt cracks in his left shoulder. Jones indicated that he had been experiencing these problems for about eight months and that they were causing him difficulty at work. During the course of his examination, Dr. Ro also noticed that Jones exhibited some muscle stiffness in his upper left arm and face. Although Dr. Ro found that Jones appeared to exhibit signs of a minor atypical tremor, he diagnosed Jones as suffering from idiopathic Parkinson's disease. At that time, Dr. Ro prescribed sinemet, a medication commonly given to patients suffering from idiopathic Parkinson's disease. Dr. Ro met with Jones two months later, and Jones indicated that the medication made him feel better.
 
 
 13
 In 1988, Jones was referred to Dr. Kathleen Shannon, another neurologist, by a colleague who believed that Jones might be a good candidate for a study being conducted that sought to determine whether a certain drug would be effective in slowing down the progression of idiopathic Parkinson's disease. Dr. Shannon's role in that study was to evaluate potential candidates to ensure that they had idiopathic Parkinson's disease. In explaining how she evaluated whether a patient suffered from idiopathic Parkinson's disease as opposed to some other form of Parkinsonism, Dr. Shannon testified that she would first determine whether the patient had at least two of the general Parkinsonian symptoms-- that is, the typical features associated with idiopathic Parkinson's disease. Then she would look to ensure that the patient did suffer from an "atypical" Parkinsonism, a disorder, like manganism, by examining the patient for atypical symptoms commonly associated with those atypical disorders but not idiopathic Parkinson's disease.
 
 
 14
 In the course of her neurological examination of Jones, Dr. Shannon observed that Jones exhibited a number of the general symptoms typical of idiopathic Parkinson's disease. He had a mild resting tremor in his hand, some rigidity in his neck, arms, and left leg, and slowness of movement in his left side. Significantly, Dr. Shannon found no atypical features. Based on her examination of Jones and her evaluation of his medical history,[2] Dr. Shannon diagnosed him with idiopathic Parkinson's disease and enrolled him in the study. Dr. Shannon examined Jones on several subsequent occasions during the course of the study and her diagnosis remained unchanged.
 
 
 15
 In the Spring of 1989, Jones saw yet another neurologist, Dr. Leslie Galen, Jones's treating physician in Las Vegas, Nevada.[3] Dr. Galen examined Jones several times during a period of approximately four years. Dr. Galen also prescribed anti-Parkinson's disease medications, including sinemet. In treating Jones, Dr. Galen noticed that these medications initially improved Jones's overall condition, although he still had a resting tremor in his left hand, and that, during the course of Dr. Galen's treatment of Jones, he noticed no significant negative change in Jones's symptoms. Although unaware of Jones's prior exposure to manganese, Dr. Galen also concluded that Jones suffered from idiopathic Parkinson's disease based on his examination of Jones and Jones's response to treatment.
 
 
 16
 In 1992, Jones filed the instant suit against Defendants, alleging that the manganese contained in the fumes generated by their welding rods caused his neurological injuries. Jones asserted claims of negligence and strict liability, alleging that Defendants knowingly manufactured and sold welding rods containing manganese even though they knew of the dangers and hazards associated with manganese in welding fumes. Despite this knowledge, Jones submitted that Defendants failed to take reasonable precautions against the readily foreseeable harm that would be caused by their products and failed to provide adequate warnings and instructions on how to safely use their allegedly toxic welding rods.
 
 
 17
 The central issue at trial, however, was whether Jones suffered from manganism or idiopathic Parkinson's disease. Defendants vigorously contested Jones's assertion that he suffered from manganism brought on by exposure to their welding rods. In support of their theory that Jones suffered from idiopathic Parkinson's disease that was causally unrelated to any manganese exposure from their products, Defendants introduced testimony from Jones's treating physicians, all of whom had diagnosed him with idiopathic Parkinson's disease, and the testimony from a paid medical expert, Dr. Charles Olanow,[4] who concurred with their assessment based upon his own examination of Jones and a review of Jones's medical and work history.
 
 
 18
 According to Dr. Olanow, an experienced neurologist can distinguish whether a patient suffers from idiopathic Parkinson's disease or manganism by conducting a clinical examination of the patient focusing on the symptoms exhibited and looking at the patient's response to certain medications. Dr. Olanow explained that idiopathic Parkinson's disease and manganism are generally thought to cause cell damage in distinct parts of the brain. Dr. Olanow noted that the part of the brain most commonly affected by idiopathic Parkinson's disease is the substantia nigra; whereas manganism primarily affects two other parts of the brain known as the striatum and globus pallidus. Because the two diseases tend to affect different parts of the brain, a particular patient's response to certain medications is a strong indicator as to the type of Parkinsonism afflicting the patient. Dr. Olanow testified that the cells in the substantia nigra produce dopamine, a chemical through which messages are sent to certain other parts of the brain, including the striatum. Idiopathic Parkinson's disease reduces the number of cells in the substantia nigra which causes a corresponding reduction in the level of dopamine in the brain. This loss of dopamine brings about the symptoms commonly associated with idiopathic Parkinson's disease. In treating a patient suspected of suffering from idiopathic Parkinson's disease, a physician can replace the loss of dopamine with a dopamine substitute, such as sinemet, and the patient usually will respond favorably. On the other hand, a patient with damage to the globus pallidus or striatum, as is generally the case with manganism, typically will not have a beneficial response to dopamine replacement therapy because dopamine does not have any significant impact on the ability of the striatum or globus pallidus to receive messages. As a result, increasing the dopamine level of a patient suffering from manganism tends not to alleviate any Parkinsonian symptoms exhibited because that disorder does not affect the brain's ability to produce dopamine. Jones's favorable response to sinemet was one of the bases for Dr. Olanow's opinion that Jones has idiopathic Parkinson's disease.
 
 
 19
 In addition to a patient's response to medication, the particular symptoms exhibited by the patient are often a strong indicator as to whether that patient has idiopathic Parkinson's disease or manganism. Although idiopathic Parkinson's disease and manganism often share some of the four general symptoms associated with Parkinsonism, Dr. Olanow testified that certain symptoms are more commonly attributed to one or the other disease. Dr. Olanow identified those symptoms strongly indicative of idiopathic Parkinson's disease as including the presence of a resting tremor, rigidity, asymmetry (meaning that the tremors begin on one side of the body rather than both), and slowness. Patients suffering from manganism, on the other hand, are usually found not to have a resting tremor. Instead, manganism tends to manifest certain "atypical" features not normally found in idiopathic Parkinson's disease, such as speech and prominent early gait disturbances, and myoclonic syndrome, which is an involuntary muscle contraction that can lead to difficulty in walking and a facial grimace.
 
 
 20
 Dr. Olanow examined Jones in July 1993. Dr. Olanow indicated that during the course of the examination, Jones told him about the progression of his injuries, beginning with the resting tremor in his left hand and leading to impaired coordination and stiffness on his left side. Jones also informed Dr. Olanow that he had been taking sinemet and that he believed the medication had helped him substantially. When conducting the neurological part of the examination, Dr. Olanow observed that Jones's speech was slightly reduced, his face had a staring quality to it with a decreased amount of blinking, he had a resting tremor in his left hand, and he exhibited signs of stiffness and reduced movements on the left side of his body. Dr. Olanow also observed that Jones walked quite well, although he had reduced arm swing on his left side, he had relatively normal postural stability, and that overall his movements were quite "slow"--all observations that were consistent with a finding of idiopathic Parkinson's disease. Dr. Olanow also noticed that Jones's Parkinsonian symptoms became more pronounced over the course of the examination, which indicated that the dopamine replacement medication had begun to lose its effectiveness, causing his Parkinsonian features to become more prominent. Dr. Olanow found no evidence of myoclonism or any noticeable presence of any other "atypical" feature that would suggest manganese intoxication. Based on these observations, Dr. Olanow concluded that Jones suffered from idiopathic Parkinson's disease.
 
 
 21
 In support of his theory that he actually suffered from manganism, not idiopathic Parkinson's disease, and that the manganese exposure from Defendant's welding rods caused his neurological injuries, Jones relied on the testimony of his paid expert medical witness, Dr. Harold Klawans.[5] Dr. Klawans testified that it is not possible to determine whether a patient suffers from idiopathic Parkinson's disease or manganism by looking solely at the patient's clinical symptoms. Instead, Dr. Klawans believed the foremost and determinative factor in assessing whether a patient suffers from idiopathic Parkinson disease or manganism is the patient's history--whether the patient has a history of manganese exposure.
 
 
 22
 Dr. Klawans testified that a welder, like Jones, who is exposed to welding fumes containing manganese and breathes in those fumes, is at risk of developing manganism because the manganese from the welding fumes is absorbed by the lungs when the welder inhales the fumes. The manganese then crosses from the lung into the bloodstream with some of the manganese making its way up into the brain where it causes neurological damage. Once in the brain, Dr. Klawans testified that manganese can damage cells in a number of areas including not only those areas typically damaged by manganism, namely the striatum and the globus pallidus, but also the substantia nigra, the area Defendants' expert identified as usually being affected only by idiopathic Parkinson's disease. Thus, Dr. Klawans suggested that both diseases could cause a loss of dopamine in the brain and, therefore, a patient with manganism could respond favorably to dopamine replacement therapy. For that reason, Dr. Klawans also testified that he would prescribe sinemet or a similar dopamine replacement medication to a patient suffering from manganism.
 
 
 23
 On cross examination, however, Dr. Klawans acknowledged that the two diseases tend to affect different parts of the brain, with idiopathic Parkinson's disease typically damaging the substantia nigra thereby causing the general signs and symptoms common to that disease. Dr. Klawans also agreed that manganese more often damages the globus pallidus and striatum than it does the substantia nigra, with the result being that patients with manganism usually will respond less well to dopamine replacement therapy than patients suffering from idiopathic Parkinson's disease. In addition, while Dr. Klawans testified that a patient afflicted with manganism could exhibit some or all of the symptoms commonly seen in a patient suffering from idiopathic Parkinson's disease, he acknowledged that certain other symptoms, the "atypical" features described above, more often appear in patients suffering from manganism.
 
 
 24
 Dr. Klawans examined Jones once, in September 1992, at the behest of Jones's counsel. The only "atypical" symptom Dr. Klawans found during his examination of Jones was myoclonic syndrome (the abnormal, involuntary jerking of muscles)--a feature that none of the other neurologists who examined Jones found to be present. Undercutting the significance of the presence of this symptom, Dr. Klawans indicated that long-term dopamine replacement therapy could cause myoclonus, although Dr. Klawans did not believe that to be true in Jones's case because of the absence of other dopamine-induced symptoms one would normally expect to find if the myoclonus was caused by dopamine replacement therapy. In any event, based on his neurological examination, the presence of myoclonus, and Jones's history of manganese exposure from Defendants' welding rods, Dr. Klawans concluded that Jones suffered from manganism.
 
 
 25
 Despite diagnosing Jones with manganism, Dr. Klawans observed that Jones exhibited all of the symptoms common to idiopathic Parkinson's disease: the resting tremor; impaired postural balances; stiffness and rigidity; bradykinesia; an absence of any prominent gait-disturbance; a favorable response to dopamine replacement therapy; and normal progression of the disease. In fact, with the exception of myoclonus, every sign and symptom Dr. Klawans found was consistent with a finding that Jones suffered from idiopathic Parkinson's disease and Dr. Klawans acknowledged that his diagnosis of manganism was premised entirely on the presence of myoclonus and Jones's work history. With respect to Jones's work history and prior exposure to manganese, Dr. Klawans's testimony revealed that he knew little more than that Jones had been exposed to manganese during the course of his career as a welder--he indicated that he did not know the percent of manganese in the welding rods used by Jones, the permissible exposure limit for manganese, any details of the environments in which he welded, or the amount of manganese required in welding fumes to afflict a person with manganism.
 
 
 26
 Although the bulk of the trial focused on the issue of whether Jones actually suffered from manganism, the parties also contested whether manganese, in the form it takes in the mild steel welding fumes generated by Defendants' welding rods, could cause the type of neurological injuries claimed by Jones. Jones asserted that the welding fumes emitted by the burning of Defendants' welding rods caused him to develop manganism. In support of that theory, Jones offered the testimony Dr. Klawans who testified that medical research showed that manganese contained in welding fumes could lead to the onset of manganism in welders and that it was his opinion that Jones developed manganism as a result of his exposure to the manganese generated by Defendants' welding rods.
 
 
 27
 Defendants offered contrary evidence suggesting Jones's manganese exposure from their welding rods was too insignificant to actually cause manganism. Dr. Thomas Eager, a professor of materials engineering and the head of the Department of Material Science and Engineering at the Massachusetts Institute of Technology, testified for the Defendants as an expert witness in metallurgy. Dr. Eager provided testimony at trial on a number of subjects, including the history and uses of welding, a description of how the welding process works and how welding fumes are generated, the chemical composition of welding fumes, proper ventilation during welding, and an estimate of how long a person who is welding is actually exposed to welding fumes. Dr. Eager has an extensive background in welding and testified that it was his expert opinion that Jones's manganese exposure from welding with Defendants' welding rods would have been less than the industry recommended maximum manganese exposure levels ("threshold limit values") given the work environments in which Jones worked, the type of welding he engaged in, the form of the manganese in the welding fumes, and the amount of time he actually spent welding.
 
 
 28
 On appeal, Jones argues that the district court improperly admitted portions of Dr. Eager's testimony, and as a result, he is entitled to a new trial. Specifically, Jones challenges the admission of Dr. Eager's testimony regarding (1) his role in research studying the effects of welding fumes on the lungs of animals and the results of that research ("Joint Research") and (2) an epidemiological study of welders at Caterpillar ("Caterpillar Study").
 
 
 29
 With respect to Dr. Eager's testimony regarding the Joint Research, Dr. Eager testified that the form of the manganese in the welding fumes is different in chemical composition than naturally occurring manganese. The manganese takes on this different form by combining with other elements given off by the melting of the mild steel and, according to Dr. Eager, this causes the manganese contained in welding fumes to have a different reactivity with the lungs than pure manganese. Defense counsel then asked Dr. Eager whether he believed this would have an impact on the body's ability to absorb the manganese. At this point, Jones objected on the basis that this line of questioning sought testimony from Dr. Eager that was outside his expertise as a metallurgist. The district court sustained the objection subject to defense counsel laying a proper foundation.
 
 
 30
 In an attempt to lay a foundation for this testimony, Dr. Eager testified, over several objections, that he conducted "joint research" studying the effect of welding fumes in the lungs of laboratory animals with Dr. Joseph Brain, a professor at the Harvard University School of Public Health, and Dr. Gael Ulrich, a professor of chemical engineering at the University of New Hampshire. Dr. Eager indicated that he worked with Dr. Brain for the last three to four years, that they had discussed their research activities with each other, and that they had published papers together and reached certain conclusions from their Joint Research. After this testimony was elicited, defense counsel asked Dr. Eager about the conclusions the Joint Research reached regarding the form of the manganese in the welding fumes and the ability of the body to absorb manganese in that form. Jones again objected, arguing that each of the professors brought their own expertise to the research and that Dr. Eager sought to testify about medical matters that were outside his expertise. Jones complained that the medical expert, Dr. Brain, was not present to discuss the conclusions reached regarding the body's ability to absorb manganese and the basis for those conclusions. The district court overruled Jones's objection, concluding that the professors discussed their joint research and, in essence, taught one another their particular areas of expertise. On that basis, the district court concluded that Dr. Eager was qualified to testify as to the conclusions reached by the Joint Research.
 
 
 31
 Dr. Eager then proceeded to testify that the Joint Research concluded that there was no difference between placing welding fumes or saline solution or non-toxic iron oxide into the animal's lungs. Defense counsel then asked Dr. Eager whether their research led to any conclusions regarding the toxicity of manganese in welding fumes. Jones again objected on the ground that the question called for testimony beyond Dr. Eager's expertise. After Dr. Eager explained that the conclusions were drawn by all three professors after discussing the various disciplines involved in reaching the conclusions, the district court allowed Dr. Eager to proceed and he testified that there was no measurable effect of welding fumes containing manganese on the lungs.
 
 
 32
 Jones also objected to testimony elicited from Dr. Eager regarding the Caterpillar Study. On cross-examination, Jones asked Dr. Eager whether he had ever encouraged the American Welding Society, an organization that seeks to promote the knowledge and science of welding, or any of the companies that are members of that society, to conduct an epidemiological study to determine the health effects of welding fumes on welders. Dr. Eager testified that he had not encouraged such a study. On redirect examination, Dr. Eager stated that he did not believe an epidemiological study was required because one had already been completed, namely, the Caterpillar Study, and that the Caterpillar Study had showed that welders did not experience any more diseases or health effects than non-welders working at Caterpillar. Jones did not immediately object to the admission of this testimony at the time it was offered.
 
 
 33
 At the close of Dr. Eager's testimony, which concluded the testimony for the day, Jones made an oral motion to strike Dr. Eager's testimony regarding the Joint Research on the ground it was outside his expertise and Dr. Eager's testimony regarding the Caterpillar Study on the ground that it was not disclosed to Jones prior to trial in accordance with Federal Rule of Civil Procedure 26. With respect to the Joint Research, the district court declined to reconsider its prior rulings. Turning to Dr. Eager's testimony regarding the Caterpillar Study, the district court determined that Jones had waived his Rule 26 objection because he failed to object to the testimony at the time it was offered or immediately thereafter. The following morning, Jones submitted a written motion to strike, renewing his objections to the admission of both portions of Dr. Eager's testimony. He argued that the testimony went beyond Dr. Eager's expertise and that Defendants had failed to disclose, in accordance with Rule 26, that Dr. Eager would be relying on the Joint Research and the Caterpillar Study at trial. The district court denied that motion on the same basis it had denied the prior oral objections.
 
 
 34
 The jury returned a verdict in favor of Defendants on all counts alleged in the complaint. Jones then filed his first appeal, arguing that the district court erred in overruling his objections to the admission of Dr. Eager's testimony regarding both the Caterpillar Study and the Joint Research. In addition, Jones argues that the district court erred in overruling his objections to defense counsel's improper closing argument. Jones alleges that defense counsel improperly argued during his closing statement that Jones and his attorneys were trying to "trick the jury" into finding in favor of Jones.
 
 
 35
 While that appeal was pending, Jones claimed that he uncovered "new" evidence which shows that Dr. Eager's testimony with regard to the Joint Research and the Caterpillar Study was false. Specifically, Jones alleged that Dr. Eager testified falsely with respect to the facts that formed the basis for the district court's ruling that he had the necessary qualifications to provide testimony on the toxicity of manganese in welding fumes and the ability of the body to absorb manganese in that form, the conclusions reached by the Joint Research, and the conclusions reached by the Caterpillar Study. Based on this allegedly false testimony, Jones moved for a new trial pursuant to Federal Rule of Civil Procedure 60(b)(2) and filed a motion for rule to show cause why Dr. Eager should not be held in contempt of court. The district court denied both motions.
 
 
 36
 The district court denied Jones's motion to hold Dr. Eager in contempt because Jones failed to show that Dr. Eager's allegedly false testimony obstructed the court's authority to conduct orderly proceedings. Without reaching the issue of whether Dr. Eager's testimony was false, the court concluded that the nature and purpose of civil contempt did not warrant applying the contempt power to a witness who merely provided false testimony absent some showing that the false testimony obstructed the court's ability to conduct the trial. Jones's second appeal is from that order.
 
 
 37
 The district court denied Jones's Rule 60(b)(2) motion concluding that: (1) certain portions of the "newly discovered" evidence could have been discovered in time to move for a new trial under Rule 59(b) and therefore this evidence was not "new" within the meaning of Rule 60(b)(2) and (2) the remaining challenged testimony did not materially mischaracterize the purported truth of the underlying matters. Furthermore, the court concluded that Jones was not entitled to Rule 60(b)(2) relief in any event because Jones failed to establish that a new trial without Dr. Eager's allegedly false testimony would probably produce a new result. Jones's third and final appeal is from that order.
 
 II. Analysis
 
 38
 A. Jones Is Not Entitled To A New Trial On The Ground That The District Court Erred In Overruling His Objections To Certain Portions of Dr. Eager's Testimony
 
 
 39
 We first address Jones's arguments that the district court erred in overruling his objections to the portions of Dr. Eager's testimony regarding the Joint Research and the Caterpillar Study. In order to convince us that a new trial is warranted based on the admission of this testimony, Jones must satisfy three conditions. First, for those portions of the challenged testimony for which the district court ruled that Jones's objection was untimely and, therefore, waived, Jones must show that he objected in a timely and proper manner before the district court. See United States v. Krankel, 164 F.3d 1046, 1052 (7th Cir.1998). Second, he must show that the district court abused its discretion in admitting the challenged testimony. See General Elec. Co. v. Joiner, 522 U.S. 136, 118 S. Ct. 512, 517 (1997). Third, he must show that any error made by the district court in admitting the evidence was more than harmless error by showing that the exclusion of this evidence probably would have produced a different outcome in the case. See Chapman v. California, 386 U.S. 18, 22-24 (1967).
 
 
 40
 1. Dr. Eager's Testimony Regarding the Joint Research
 
 
 41
 Jones argues that the district court erred in permitting Dr. Eager to testify regarding the ability of the body to absorb manganese from welding fumes generated by mild steel welding rods, the toxicity of manganese contained in welding fumes, and the results of the Joint Research concerning the effect of manganese from welding fumes on lungs of animals, because Dr. Eager was not qualified under Federal Rule of Evidence 702 to offer an opinion on these matters. Because there is no colorable issue as to whether Jones timely objected to Dr. Eager's expertise and qualification to testify on these matters,[6] we turn directly to the issue of whether the district court erred in overruling his objections and admitting this testimony into evidence.
 
 
 42
 We review a district court's decision to admit expert testimony under an abuse of discretion standard. See General Elec. Co., 118 S. Ct. at 517; Krankel, 164 F.3d at 1052. "Trial judges have discretion in determining whether a proffered expert is qualified to testify," see Raymond v. Raymond Corp., 938 F.2d 1518, 1526 (7th Cir. 1991), and, therefore, our review of the district court's determination of an expert's qualifications to testify is necessarily deferential. However, in the present case, we are not wholly convinced that the district court exercised proper discretion in concluding that Dr. Eager was qualified to testify as to the challenged matters relating to the Joint Research.
 
 
 43
 Rule 702 of the Federal Rules of Evidence sets the standard governing the admissibility of expert testimony and that Rule provides:
 
 
 44
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 45
 Fed. R. Evid. 702. Pursuant to Rule 702, a witness may offer an expert opinion only if he or she draws on some special "knowledge, skill, experience, training, or education" to formulate that opinion. Id. However, "the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." United States v. Benson, 941 F.2d 598, 604 (7th Cir. 1991) "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir. 1990).
 
 
 46
 The challenged testimony offered by Dr. Eager regarding the Joint Research concerns matters that are most aptly classified as medical or biological in nature given that Dr. Eager was asked to testify as to the toxicity of manganese in manganese fumes and the lung's ability to absorb manganese from those fumes. However, Dr. Eager's formal education and experience lie in the field of material science and metallurgy and he was offered as an expert in metallurgy at trial. He has a Bachelor of Science degree in Metallurgy and Material Science from MIT and a Doctorate in Metallurgy from the same institution. While Dr. Eager undoubtedly is a very intelligent individual, he is not a medical doctor nor is there any indication in the record that suggests that he has any experience in assessing the toxicology or other health effects of manganese on the body aside from his participation in the Joint Research with Dr. Brain. Indeed, Dr. Eager acknowledged on cross- examination that he was not a toxicologist and that toxicology and how certain substances are absorbed into the body were areas that were outside of his expertise. It stands to reason then that the underlying basis for the medical conclusions to which Dr. Eager testified was derived primarily, if not completely, from Dr. Brain's expertise and that these conclusions were rooted in medical knowledge and training which Dr. Eager did not have. As such, we believe that Dr. Eager lacked sufficient expertise to testify about the conclusions reached by the Joint Research, and, therefore, the district court should have barred him from testifying on these matters. See, e.g., United States v. Hirschberg, 988 F.2d 1509, 1514 (7th Cir. 1993) ("Expert opinion is gained from a 'special skill, knowledge, or experience,' and is a reasoned decision drawn from the witness' expertise." (quoting United States v. Benson, 941 F.2d 598, 604 (7th Cir. 1991))); United States v. Kladouris, 964 F.2d 658, 670 (7th Cir. 1992) (affirming district court's ruling that a proffered witness's lack of training in chemistry prevented him from testifying as an expert on the significance of the presence of chemicals at the scene of the fire). Furthermore, to the extent that Dr. Eager was merely conveying Dr. Brain's conclusions with respect to the Joint Research, Dr. Brain, not Dr. Eager, would be the proper person to testify about those findings.[7]
 
 
 47
 Moreover, while it is true that Rule 702 provides that a witness can be qualified as an expert without formal training or education by virtue of his or her experience, we do not believe that Dr. Eager's participation in the Joint Research is the kind of experience that Rule 702 contemplates as the basis for qualifying an expert to testify at trial--i.e., extensive hands-on experience over a meaningful period of time during which a person develops a working expertise in a certain area. See, e.g., United States v. Tipton, 964 F.2d 650, 654 (7th Cir. 1992). Dr. Eager testified that he was not involved in the day-to-day research of the Joint Research and it appears that his knowledge regarding the matters upon which he testified was derived mostly from periodic discussions with Dr. Brain and others involved in the research. We seriously doubt that the discussions that occurred between Drs. Eager, Brain, and Ulrich were comprehensive enough either in scope or detail to allow Dr. Eager to develop the expertise required by Rule 702 with respect to this testimony.
 
 
 48
 Nevertheless, even though the district court may have abused its discretion in admitting Dr. Eager's testimony on these matters, reversal is required, and a new trial is warranted under Rule 103(a), only if the error has affected "a substantial right of the party." See Fed. R. Evid. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ."); see also Fed. R. Civ. P. 61 ("No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial . . . unless [the] refusal to take such action appears to the court inconsistent with substantial justice."). Accordingly, we will not reverse a jury verdict if an erroneous admission of expert testimony is harmless. See DeBiasio v. Illinois Cent. R.R., 52 F.3d 678, 685 (7th Cir. 1995); see also Cook v. Hoppin, 783 F.2d 684, 691 (7th Cir. 1986) ("The improper admission of evidence provides a basis for granting a new trial only if the error is prejudicial."). An error is considered to be harmless if it did not contribute to the verdict in a meaningful manner. See Chapman, 386 U.S. at 22-24; see also DeBiasio, 52 F.3d at 685 ("An erroneous evidentiary ruling is harmless and 'does not affect substantial rights unless there is a significant chance that it has affected the result of the trial.'" (quoting Walton v. United Consumers Club, Inc., 786 F.2d 303, 313 (7th Cir. 1986))). After careful review of the record, we conclude that the exclusion of Dr. Eager's testimony relating to the Joint Research would most likely not have resulted in a jury verdict in Jones's favor; thus, any error in admitting Dr. Eager's testimony was harmless. We reach this conclusion for three reasons.
 
 
 49
 First, the dispositive issue at trial was whether Jones suffered from idiopathic Parkinson's disease, which the medical evidence at trial showed to be causally unrelated to gross manganese exposure, or manganism. Jones's theory of the case was that he suffered from manganism and that the manganese contained in welding fumes emitted from Defendants' welding rods led to the onset of his manganism. The testimony with which Jones takes issue relates to whether the manganese content of welding fumes is sufficient to cause manganism. However, in order to prevail at trial, Jones had to prove, first and foremost, that he actually suffered from manganism. Evidence that clearly shows that Jones did not suffer from manganism in the first place substantially diminishes the relative importance of testimony regarding whether welding fumes emitted from Defendants' products could have caused Jones to develop that disorder.
 
 
 50
 The overwhelming medical evidence at trial indicated that Jones suffers from idiopathic Parkinson's disease rather than manganism. Both Defendants' medical expert, Dr. Olanow, and all of Jones's own treating physicians diagnosed Jones with idiopathic Parkinson's disease. Although a diagnosis of idiopathic Parkinson's disease, by definition, means Parkinson's disease without a known cause, the testimony of Dr. Olanow and Jones's treating physicians either expressly or implicitly ruled out manganese exposure as the originating cause of Jones's neurological injury. Both Dr. Olanow and Dr. Shannon explained that manganism and idiopathic Parkinson's disease are distinct medical conditions that generally affect different parts of the brain. While the two conditions may have similar symptoms, the medical testimony introduced by both Defendants and Jones clearly showed that each disorder also has unique symptoms. Dr. Olanow and the treating physicians testified that Jones exhibited those symptoms consistent with idiopathic Parkinson's disease and that there was a noticeable absence of "atypical" features suggesting that Jones suffered from manganism. They also testified that Jones responded favorably to dopamine replacement medication--another indicator that Jones was afflicted with idiopathic Parkinson's disease rather than manganism. Only Jones's paid medical expert, Dr. Klawans, reached the conclusion that Jones suffered from manganism and his testimony was substantially undermined during cross- examination when he acknowledged that manganism and idiopathic Parkinson's disease are distinct medical conditions, that the two disorders usually tend to damage different parts of the brain, that most patients with idiopathic Parkinson's disease respond favorably to dopamine replacement therapy while patients with manganism generally do not, and that patients suffering from manganism usually experience certain symptoms, such as myoclonus, that are not commonly seen in patients who suffer from idiopathic Parkinson's disease. Although Dr. Klawans concluded that Jones suffered from manganism, he testified that Jones had responded favorably to dopamine replacement therapy, that Jones had resting tremors, and that Jones exhibited no signs of prominent, early gait disturbance--all factors that would indicate that Jones suffered from idiopathic Parkinson's disease rather than manganism. Indeed, Dr. Klawans indicated that he based his diagnosis of manganism primarily on Jones's work history and the presence of myoclonus. However, none of the other physicians who examined Jones testified that he had myoclonus and Dr. Klawans acknowledged that dopamine-replacement therapy, which Jones had been undergoing for four years by the time Dr. Klawans examined him, could account for the presence of myoclonus in Jones. When all of this medical evidence is taken into account and viewed in its proper light, we cannot accept Jones's implicit contention that the jury resolved the issue of whether he suffered from manganism in his favor and returned a verdict for Defendants only because it believed Dr. Eager's testimony that the manganese contained in welding fumes emitted from Defendants' welding rods did not have an appreciably negative health effect on animal lungs.
 
 
 51
 Second, given the fact that Dr. Eager is not a medical doctor or toxicologist, and that Jones highlighted this fact during cross-examination, the jury is likely to have heavily discounted his testimony concerning the conclusions reached by the Joint Research, especially when Defendants did not enter into evidence any substantiating documents underlying the Joint Research. As such, Jones clearly conveyed Dr. Eager's lack of qualification to testify on these matters to the jury. "[G]enerally, the jury is intelligent enough, aided by counsel, to ignore what is unhelpful in deliberations." Benson, 941 F.2d at 605 (internal quotations and citation omitted).
 
 
 52
 Third, Jones introduced a number of studies and other documentary materials into evidence that suggested that manganese in welding fumes could lead to the onset of manganism and other health problems in welders. In addition, Jones's medical expert testified that, in his opinion, welding fumes containing manganese could cause manganism in welders by allowing manganese to enter into the lungs when the welder breathes in these fumes. Manganese may then be absorbed into the bloodstream and make its way into the brain where it may cause neurological damage. Thus, even if the jury accepted Dr. Eager's testimony as reliable, Jones introduced evidence to challenge those conclusions. In fact, we believe the jury likely placed little weight on Dr. Eager's testimony given that Defendants placed warnings on their products that breathing welding fumes could be hazardous to the welder's health.
 
 
 53
 For these reasons, we conclude that any error by the district court in allowing Dr. Eager to testify as to the conclusions reached by the Joint Research was harmless.
 
 
 54
 2. Dr. Eager's Testimony Regarding the Caterpillar Study
 
 
 55
 Jones next argues that the district court erred in permitting Dr. Eager to testify about the conclusions reached by the Caterpillar Study with respect to the health effects of welding on welders because Defendants failed to disclose that Dr. Eager would be relying on that study at trial. Because Jones did not object to this testimony until the close of Dr. Eager's testimony, the district court considered the objection waived, concluding that a Rule 26 objection must be lodged contemporaneously with or immediately after the testimony is offered into evidence. Defendants now argue that Jones is barred from challenging the admission of Dr. Eager's testimony regarding the Caterpillar Study on appeal because he failed to object to this testimony in a timely manner before the district court.
 
 
 56
 To preserve an issue for appeal, Rule 103(a) of the Federal Rules of Evidence provides that a party objecting to the admission of evidence must make "a timely objection or motion to strike" before the district court. See Fed. R. Evid. 103(a). When a party fails to timely and properly object at trial to the admission of evidence, the party is deemed to have waived the issue on appeal. See Krankel, 164 F.2d at 1052; United States v. Wynn, 845 F.2d 1439, 1442 (7th Cir. 1988).
 
 
 57
 We note at the outset of our analysis that this is not the usual situation in which there is a total absence of an objection below or in which the movant raises an objection on appeal on a ground different from that presented to the district court--both of which normally would constitute a waiver on appeal. See e.g., Williams v. Jader Fuel Co., 944 F.2d 1388, 1405 (7th Cir. 1991); United States v. Field, 875 F.2d 130, 134 (7th Cir. 1989). Jones objected to the admission of Dr. Eager's testimony regarding the Caterpillar Study before the district court on the ground he now asserts on appeal. The difficulty lies, however, in the fact that Jones did not lodge this objection until the close of Dr. Eager's testimony, which is when Jones professes he first became aware that Defendants had not disclosed that Dr. Eager would rely on this study at trial, rather than at the exact time that the testimony was introduced and admitted into evidence.
 
 
 58
 We are not entirely convinced that Jones should be deemed to have waived this issue on appeal. Contrary to Defendants' assertion, we do not believe it to always be the case that an objection has to be perfectly contemporaneous with the challenged testimony in order to satisfy Rule 103(a) and be considered "timely." Instead, an objection can still be deemed "timely" if it is raised within a sufficient time after the proffer of testimony so as to allow the district court an adequate opportunity to correct any error. How contemporaneous an objection must be to the challenged testimony in order to be considered "timely" under Rule 103(a) is a question of degree. Asking a court to strike testimony introduced at trial three weeks earlier would, by all accounts, be unreasonable--such an objection cannot be considered "timely" by any stretch of the imagination. On the other hand, petitioning the court to strike testimony offered by a witness at the close of that witness's testimony or prior to the start of the proceedings on the very next day when the witness was the last to testify on the preceding day, is a much closer question. In such a situation, the district court can certainly correct any error by issuing a limiting or curative instruction while the testimony is still relatively fresh in the mind of the jurors.
 
 
 59
 In the instant case we believe Jones's objection to Dr. Eager's testimony was sufficiently contemporaneous to be considered "timely" under Rule 103(a). Cf. Deppe v. Tripp, 863 F.2d 1356, 1363 n.10 (7th Cir. 1988) (suggesting that a "nearly contemporaneous" objection made at the bench at the close of a party's closing argument would preserve the matter for appellate review because it would afford the trial court an opportunity to cure the claimed error through the use of a curative instruction). Jones objected immediately after the close of Dr. Eager's testimony and asked the Court to instruct the jury to disregard the challenged portions of Dr. Eager's testimony. This objection was presented to the district court at a time when the court could still correct any error. Furthermore, this was a rather protracted litigation extending over a period of years and involving a number of expert witnesses. Rule 103 should not be construed in such a narrow manner that courts cannot, or should not, recognize the exigencies of attempting to recall on a moment's notice whether a particular document or opinion has been disclosed in an expert's Rule 26 disclosure, especially when such evidence does not concern the expert's core testimony, as is the case here. In addition, we note that this is not a situation in which Jones sought to "sandbag" the district court by sitting on an alleged error for tactical reasons and raising the issue only when his case made a turn for the worse. The objection was sufficiently contemporaneous and, if anything, given the limited nature of Dr. Eager's testimony regarding the Caterpillar Study, more attention, not less, would have been drawn to Dr. Eager's testimony if the district court had ruled in favor of Jones and issued a limiting instruction--a consequence Jones was apparently willing to accept. For these reasons, we are inclined to find that Jones's objection to this testimony on Rule 26 grounds is not waived on appeal.
 
 
 60
 Once it has been determined that a particular objection was timely, a litigant must then show that the district court abused its discretion in so ruling and that any error by the district court in admitting this evidence was more than harmless. We review a district court's decision to admit or exclude evidence under Rule 26 for an abuse of discretion. See Cummins v. Lyle Indus., 93 F.3d 362, 371 (7th Cir. 1996).
 
 
 61
 Rule 26(a)(2) requires a party to make certain pre-trial disclosures regarding expert testimony to opposing counsel including "a complete statement of all opinions to be expressed and the basis and reasons therefor . . . [and] the data or other information considered by the witness in forming the opinions." Fed. R. Civ. P. 26(a)(2)(B). Subsections (a)(2)(C) and (e)(1) of that rule require that the expert's disclosure be supplemented if there are any additions or changes to the information previously disclosed.
 
 
 62
 Defendants failed to disclose to Jones that Dr. Eager would be relying on the Caterpillar Study at trial. As a general rule, if a party fails to disclose information in accordance with Rule 26(a), that party "shall not, unless such failure is harmless, be permitted to use as evidence at a trial any . . . information not so disclosed." Fed. R. Civ. P. 37(c)(1). This sanction is "automatic and mandatory" unless the party can show that the violation "was either justified or harmless." Finley v. Marathon Oil Co., 75 F.3d 1225, 1230 (7th Cir. 1996).
 
 
 63
 Because its ruling to allow Dr. Eager to testify regarding the Caterpillar Study was premised upon its conclusion that Jones had waived his Rule 26 objection, the district court did not reach the issue of whether it was proper to admit this testimony in light of Jones's Rule 26 objection. The fact that the district court did not reach this issue, however, does not affect our inquiry into whether the admission of Dr. Eager's testimony regarding the Caterpillar Study into evidence justifies granting Jones a new trial. Even if we assume that Defendants' non-disclosure was unjustified, we nevertheless conclude that it was harmless and any error by the district court in allowing Dr. Eager to testify about the Caterpillar Study at trial, if indeed there was any error, was harmless error that does not warrant a reversal.
 
 
 64
 Dr. Eager testified that the Caterpillar Study showed that welders did not experience any more diseases or health effects than non-welders working at Caterpillar. This testimony is more or less cumulative of his testimony regarding the Joint Research because both portions of his testimony conveyed the message to the jury that the manganese content in welding fumes generated by mild steel welding rods is too insignificant to cause manganism in welders. Accordingly, we conclude that the admission of Dr. Eager's testimony concerning the Caterpillar Study is harmless error for essentially the same reasons we found that the court's admission of Dr. Eager's testimony regarding the Joint Research was harmless: (1) the overwhelming medical evidence at trial strongly supported a finding that Jones suffered from idiopathic Parkinson's disease rather than manganism; (2) Dr. Eager was not qualified to testify as to the health effects of breathing welding fumes and the Defendants established this fact during cross-examination; and (3) Jones introduced a substantial amount of evidence to show that manganese in welding fumes could lead to the onset of manganism and other health problems in welders. Furthermore, we note that Dr. Eager's testimony regarding the Caterpillar Study, which itself was never introduced into evidence, was of a very limited scope as it consisted of a single question and answer.
 
 
 65
 In sum, we conclude that any error by the district court in allowing Dr. Eager to testify both about the Joint Research and the Caterpillar Study was harmless error. Accordingly, Jones is not entitled to a new trial based on either of these grounds.
 
 
 66
 B. Remarks Made By Defense Counsel During Closing Argument Do Not Warrant A New Trial
 
 
 67
 Jones argues that he is entitled to a new trial because defense counsel's closing argument went beyond the bounds of acceptable advocacy. During closing argument, defense counsel strenuously argued that the medical evidence introduced at trial showed that Jones suffered from idiopathic Parkinson's disease rather than manganism. After summarizing the various medical opinions of the neurologists offered at trial, defense counsel pointed out that all of them, except for Jones's paid medical expert, had diagnosed Jones with idiopathic Parkinson's disease, and defense counsel urged the jury not to lose sight of this evidence when it determined the issue of causation. With respect to that issue, defense counsel argued that, in order to hold Defendants liable for Jones's injuries, the jury must first determine whether Jones proved that he in fact suffers from manganism before it turns to the issue of whether his neurological condition could be caused by the manganese contained in Defendants' welding rods.
 
 
 68
 In warning the jury that Jones's strategy was to distract it from focusing on the overwhelming medical evidence that showed that Jones did not suffer from manganism, Jones contends that defense counsel engaged in improper closing argument. Specifically, Jones objects to the following remarks by defense counsel:
 
 
 69
 Defense counsel: * * * They can talk about documents until the cows come home. That's their strategy. See if they can distract you and me, somehow get someone upset or mad and then we'll forget. We can't get to first base. We can't solve the fundamental medical issue, without which none of the rest matters. If you conclude that the condition of Terry Jones is idiopathic Parkinson's disease, that's it--that's it. Why was the lawsuit even brought? Let's go out and say it. I have to say what's on my mind, and I hope I don't offend anyone. That's my style. Why was it brought? Before you bring in the Defendants to the court and incur this expense, and take up your time, don't you talk to the doctors, and say, "What has Plaintiff got?" If they all tell you "idiopathic Parkinson's disease", do you file a lawsuit. Well, maybe you do. But let me tell you why you do. They say, "Look, they're big companies"--
 
 
 70
 Jones's Counsel: Objection, your Honor. It's improper argument.
 
 
 71
 Defense Counsel: Hardly.
 
 
 72
 The Court: The objection is overruled.
 
 
 73
 Defense Counsel: "They're big companies. We've got some good documents, back in '49 and '50, maybe we can trick the jury."
 
 
 74
 Jones's Counsel: Objection, your Honor.
 
 
 75
 Defense Counsel: For what?
 
 
 76
 The Court: Objection is overruled.
 
 
 77
 Defense Counsel: Maybe they can trick the jury. Maybe they can distract you, and maybe even me, to focus on that issue. Whereas the fundamental first issue to be resolved. We shouldn't be here. But we are. But we shouldn't be. At best, six to one, with a test, probably seven to nothing. Whatever it is, there is no medical condition, that Terry has--Mr. Jones has, that's caused by anything we did.
 
 
 78
 Defense counsel then argued that the evidence introduced at trial failed to show that manganese exposure from the welding fumes generated by Defendants' welding rods ever exceeded industry recommended maximum exposure levels. After discussing the testimony of Dr. Eager and Jones's expert industrial hygienist regarding whether Jones was ever exposed to unsafe levels of manganese as a result of using Defendants' welding rods, counsel argued that Jones had failed to establish that he had:
 
 
 79
 Defense counsel: So, what you have on the exposure--whether or not it's over the [threshold limit value]--is clear, from the people who took the stand. [Jones's expert] says--it was never asked, and whenever he tested, it was below. Eager says, "It's below.", and never challenged. So, where do you go, if you're them, and you've got this serious, serious problem. Documents. "Maybe I can get the jury upset enough, from things in the past, that they won't know what happened." It's the old trick-pack theory. Don't go for the bait.
 
 
 80
 Jones's counsel: I'm going to object to that, again. It's improper to suggest that we tried to trick the jury.
 
 
 81
 The Court: The objection is overruled.
 
 
 82
 On appeal, Jones argues that the district court erred in allowing defense counsel to "personally attack" Jones and his counsel during closing argument. Jones submits that defense counsel accused Jones and his counsel of filing an unmeritorious lawsuit against big companies with the hope of "tricking" the jury into awarding Jones an undeserved monetary recovery. Such improper remarks and argument, Jones contends, warrant a reversal and a new trial. We disagree.
 
 
 83
 We have repeatedly recognized that "improper comments during closing argument rarely rise to the level of reversible error." Probus v. K-Mart, Inc., 794 F.2d 1207, 1210 (7th Cir. 1986) (citation omitted). To warrant a new trial, "[s]tatements made during closing argument must be plainly unwarranted and clearly injurious to constitute reversible error." Gruca v. Alpha Therapeutic Corp., 51 F.3d 638, 644 (7th Cir. 1995); see also Arcor, Inc. v. Textron, Inc., 960 F.2d 710, 713 (7th Cir. 1992) ("Improper statements during closing arguments warrant reversal only if they 'influenced the jury in such a way that substantial prejudice resulted to' the opposing party." (quoting Fenolio v. Smith, 802 F.2d 256, 258 (7th Cir. 1986))). As such, the "district court has considerable discretion in supervising the arguments of counsel, and we will reverse a verdict only where the court has abused that discretion." Trytko v. Hubbell, Inc., 28 F.3d 715, 727 (7th Cir. 1994).
 
 
 84
 Contrary to Jones's assertion, we do not construe defense counsel's closing remarks as constituting an improper personal attack on either Jones or his counsel. In our view, these brief comments of which Jones complains were a reasonable response to Jones's assertion that he suffers from manganism and his repeated attempts during trial and his own closing statement to trivialize the medical testimony of six neurologists who each diagnosed Jones as suffering from idiopathic Parkinson's disease, unrelated to Jones's exposure to manganese. When defense counsel's closing statements are viewed in that context and in light of all the evidence presented at trial, it becomes clear that counsel was merely stressing to the jury that Defendants believed the medical evidence clearly showed that Jones suffers from idiopathic Parkinson's disease, not manganism. In that vein, defense counsel urged the jury not to lose focus of this glaring weakness in Jones's causation argument. Accordingly, defense counsel submitted that Jones's contention that the manganese contained in Defendants' products could lead to the onset of manganism could not ultimately be the dispositive factor in determining whether Defendants were liable for Jones's neurological injuries.
 
 
 85
 We find nothing improper in this line of argument. Closing arguments are the time in the trial process when counsel is given the opportunity to discuss more freely the weaknesses in his opponent's case and to highlight the strength of his own. Indeed, as the district court aptly noted, a significant part of the lawyer's role during closing arguments is to bolster the strength of his case by calling the jury's attention to certain facts or inferences that might otherwise escape the jury's attention. It is perfectly reasonable for defense counsel to discuss the weaknesses of an opponent's case during closing argument so long as counsel's argument is based on evidence admitted at trial. See Marshall v. Porter County Plan Comm'n, 32 F.3d 1215, 1221-22 (7th Cir. 1994); Trytko, 28 F.3d at 727. As we have already explained above, there is more than ample evidence in the record to support Defendants' contention that Jones has idiopathic Parkinson's disease and to belie Jones's belief that he suffers from manganism. Given the paucity of evidence showing that Jones suffered from manganism and the fact that Jones bore the burden of proving that he suffered from that disorder, we believe it was permissible for defense counsel to inform the jury that Defendants believed that no other issues need be considered in determining whether to hold Defendants liable for Jones's injuries. Consequently, we see no error in defense counsel arguing to the jury that it should resist any efforts by Jones to gloss over this gap in his causation evidence. While Jones may well be correct in his assertion that defense counsel's use of the word "trick" and the term "trick-pack" could have had some negative or inflammatory effect on the jury's perception of the strength of Jones's case, we do not believe such remarks were so egregious as to constitute improper closing argument necessitating the grant of a new trial. Cf. Lindgren v. Lane, 925 F.2d 198, 204 (7th Cir. 1991) (concluding that a prosecutor's comment during closing argument that defense counsel is attempting to "trick" the jury by presenting "illusions" is a permissible means of arguing so long as the comments are not overly excessive); see also Moylan v. Meadow Club, Inc., 979 F.2d 1246, 1250-51 (7th Cir. 1992) (concluding that defense counsel's closing remarks that plaintiff's claim for overtime wages was a "hold up" were not so egregious as to compel a new trial).
 
 
 86
 In fact, even if we were to conclude that defense counsel's argument was improper, we cannot say these statements resulted in "substantial prejudice" to Jones necessary to justify the granting of a new trial. A new trial is warranted only if allegedly improper closing remarks depart from the evidence presented at trial and result in substantial prejudice to the opposing party. See Marshall, 32 F.3d at 1221-22. We have previously recognized that improper statements during closing argument cannot be deemed to result in substantial prejudice to the moving party warranting a new trial when the evidence offered at trial is overwhelmingly in favor of the non-moving party. See Mayall v. Peabody Coal Co., 7 F.3d 570, 573 (7th Cir. 1993). The overwhelming medical evidence adduced at trial in the instant case showed that Jones suffers from idiopathic Parkinson's disease rather than manganism. In addition to the testimony of Defendants' medical expert, all five of the independent physicians who treated Jones prior to the filing of this lawsuit concluded that Jones suffered from idiopathic Parkinson's disease. Only Jones's medical expert concluded that Jones's neurological injuries were caused by exposure to manganese--but we have already explained that the weight of this testimony was significantly undermined by Defendants during cross-examination. In any event, Jones has not offered any convincing argument on appeal that defense counsel's statements resulted in substantial prejudice to his case.
 
 
 87
 Moreover, any potential prejudice to Jones by defense counsel's argument that Jones was attempting to "trick" the jury was lessened considerably by the fact that the district court instructed the jury that statements and arguments made by counsel were not to be considered evidence and that the jury should base its verdict solely on the evidence admitted in the case. We have repeatedly found that jury instructions of this sort mitigate any prejudicial effect of potentially improper remarks made by counsel during closing argument. See id.; see also Valbert v. Pass, 866 F.2d 237, 241 (7th Cir. 1989) ("[A]n instruction to the jury stating that the arguments of counsel are not evidence can mitigate the harm potentially caused by improper statements made by counsel during closing argument."). Since we "assume that the jury followed the court's cautionary instructions," see United States v. Mealy, 851 F.2d 890, 903 (7th Cir. 1988), we have no reason to believe that the jury impermissibly relied on defense counsel's argument, or any improper inference to be drawn therefrom, in reaching its verdict. See, e.g., United States v. Rose, 12 F.3d 1414, 1426-27 (7th Cir. 1994) (reasoning that courts must presume that juries heed limiting instructions that closing arguments are not to be considered evidence).
 
 
 88
 For the foregoing reasons, we conclude that the district court did not abuse its discretion in overruling Jones's objections to defense counsel's closing argument and, therefore, we find that the court did not err in refusing to grant Jones a new trial on this ground.
 
 
 89
 C. Jones Is Not Entitled A New Trial Based On 'Newly Discovered' Evidence
 
 
 90
 We next turn to address Jones's challenge that the district court erred in denying his Rule 60(b)(2) motion in which he claimed that "newly discovered" evidence showed that Dr. Eager testified falsely at trial and that evidence of this false testimony was sufficient to warrant granting him a new trial. Pursuant to Federal Rule of Civil Procedure 60(b)(2), a party may be entitled to relief from the entry of final judgment if that party presents "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). Relief under Rule 60(b)(2) "is an extraordinary remedy that is to be granted only in exceptional circumstances." Provident Sav. Bank v. Popovich, 71 F.3d 696, 698 (7th Cir. 1995). We have held that the grant of a new trial on the ground of newly discovered evidence requires proof of the following five prerequisites:
 
 
 91
 1. The evidence was discovered following trial;
 
 
 92
 2. Due diligence on the part of the movant to discover the new evidence is shown or may be inferred;
 
 
 93
 3. The evidence is not merely cumulative or impeaching;
 
 4. The evidence is material; and
 
 94
 5. The evidence is such that a new trial would probably produce a new result.
 
 
 95
 In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 78 F.3d 285, 293-94 (7th Cir. 1996). If any one of these prerequisites is not satisfied, the movant's Rule 60(b)(2) motion for a new trial must fail. See In re Wildman, 859 F.2d 553, 558 (7th Cir. 1988).
 
 
 96
 Jones's "newly discovered" evidence consisted of allegations that Dr. Eager's trial testimony concerning the Joint Research and the Caterpillar Study were false. Specifically, Jones pointed to three areas in which he submitted that Dr. Eager gave false testimony.
 
 
 97
 First, Jones alleged that Dr. Eager falsely testified to the "facts" that formed the basis for the district court's ruling that he had the necessary qualifications to offer an opinion regarding the ability of the body to absorb manganese contained in welding fumes and the toxicity of manganese in mild steel welding fumes. Jones argued that in order to qualify himself to offer an opinion as to these matters, Dr. Eager testified that he had conducted "joint research" with Professors Brain and Ulrich on the effects of welding fumes on animal lungs (the Joint Research) and that he and Professor Brain "had published papers together." Jones submits that the district court relied on that testimony as the basis for its ruling that Dr. Eager was qualified to testify as to the conclusions reached by the Joint Research regarding absorption and toxicity.
 
 
 98
 In his Rule 60(b) motion, Jones contended this testimony was false because Dr. Brain testified in a subsequent unrelated case that he had never conducted any "joint research" with Dr. Eager, nor had he published any papers with him. Moreover, Jones relied on Dr. Eager's deposition testimony from that same litigation in which Dr. Eager testified that he was not an author of the article that eventually published the results of the Joint Research ("Welding Article"), that he specifically requested to have his name removed from an earlier draft of that article because he felt that he had not made a significant contribution to the underlying research, and that his role in the Joint Research had been limited to attending researcher's meetings and providing advice on welding.
 
 
 99
 Second, having hoodwinked the court into allowing him to testify, Jones contends that Dr. Eager materially mischaracterized the conclusions reached by the Joint Research. Jones submits that Dr. Eager falsely testified that their "joint research" reached conclusions regarding the ability of the body to absorb manganese contained in welding rod fumes and toxicity of the manganese in that form. As we previously indicated, Dr. Eager testified that the Joint Research concluded that there was no difference between placing welding fumes and saline solution or non-toxic iron oxide into the animal's lungs and that there was no measurable toxic effect of the welding fume containing manganese on the lung.
 
 
 100
 Jones argued that his "newly discovered" evidence showed that the Joint Research, or more specifically, Dr. Brain, never studied or reached any conclusions with respect to these two issues. In support of his argument, Jones once again relied on Dr. Brain's deposition testimony in the subsequent unrelated case. According to Jones, Dr. Brain's testimony conflicted with Dr. Eager's trial testimony in that Dr. Brain stated that he had not studied the form of manganese in welding fumes, that the Joint Research had reached no conclusions with regard to the ability of the lung to absorb manganese or any differences in absorption between welding fumes and saline solution or iron oxide, and that he had never studied the toxicity of manganese nor had the Joint Research concluded that welding fumes had no toxic effect on the lung.
 
 
 101
 Finally, Jones argued that Dr. Eager falsely testified that the epidemiological study of welders conducted at Caterpillar (the Caterpillar Study) found a lack of manganese toxicity in welding fumes when the Study did not even address the issue. At trial, Dr. Eager testified that the Caterpillar Study concluded that welders working at a Caterpillar steel plant in Illinois did not experience "any more diseases or health effects or leukemia or cancer or anything else than people who work at Caterpillar who didn't weld."
 
 
 102
 Jones contended that this testimony was also false because the Caterpillar Study did not address the potential neurological effects of manganese in welding fumes. Instead, the Study compared causes of death among Caterpillar workers focusing primarily on lung cancer death rates. It did not, Jones submitted, address any non-fatal health effects from welding. Moreover, Jones alleged that Dr. Eager testified in subsequent unrelated proceedings that the Caterpillar Study did not examine the effects of manganese in mild steel welding fumes on welders.
 
 
 103
 After conducting two hearings and reviewing the substantial amount of evidence submitted by both parties on the veracity of Dr. Eager's trial testimony, the district court issued an order denying Jones's Rule 60(b)(2) motion. The court cited four grounds in support of its ruling. First, the district court concluded that Eager did not materially mischaracterize his participation in the Joint Research. The court found that Jones read too much into Dr. Brain's deposition testimony that he never conducted "joint research" with Dr. Eager. Placing Dr. Brain's testimony into context revealed that he has an extremely narrow personal view of what it means to conduct "joint research" with another person. According to Dr. Brain's definition, performing "joint research" meant that the other participant is so intimately associated with the research as to deserve co-authorship on any paper or papers detailing the results. Under that definition, Dr. Brain testified that he and Dr. Eager had not conducted "joint research." However, Dr. Brain did acknowledge that he had a working research relationship with Dr. Eager, that he consulted with Dr. Eager as a welding expert in connection with the Joint Research, and that Dr. Eager participated in meetings and provided advice on welding in connection with that research. Indeed, the Welding Article subsequently published by Dr. Brain and the other authors detailing the results of the Joint Research thanked Dr. Eager for his contribution. Moreover, the court found that the testimony of Dr. Ulrich and Dr. Antonini,[8] both of whom testified in connection with Jones's Rule 60(b)(2) motion, showed that Dr. Eager played a substantial, although not dominant, role in the Joint Research and was intricately involved in attempts to obtain funding for joint research proposals for welding fumes research that preceded the Joint Research. Based on this evidence, the district court found that Dr. Eager's trial testimony was not materially false.
 
 
 104
 Second, the court determined that Dr. Eager did not testify falsely regarding the results of research underlying the Joint Research. The district court concluded that Jones, at best, showed that Dr. Eager and Dr. Brain had a difference of opinion as to the results generated by the research on exposing animal lungs to welding fumes and that such a scholarly and subjective disagreement was not a sound basis for finding that Dr. Eager lied on the witness stand. In essence, the district court found that the evidence adduced in the Rule 60(b)(2) proceedings could colorably be construed to support the conclusions Dr. Eager ascribed to the Joint Research, and, therefore, Dr. Eager's testimony could not be said to be materially false.
 
 
 105
 Third, the court concluded that any Rule 60(b)(2) challenge concerning Dr. Eager's testimony with regard to the Caterpillar Study failed because Jones did not exercise due diligence in discovering the alleged falsity of Dr. Eager's trial testimony. See Fed. R. Civ. P. 60(b)(2) (providing that a movant's motion must be based on newly discovered evidence that could not have been discovered in time to move for a new trial under Rule 59(b)). The court found that the "new" evidence raised by Jones in his Rule 60(b)(2) motion purporting to show that Dr. Eager testified falsely was the Caterpillar article summarizing the Caterpillar Study's conclusions. However, the district court concluded that statements made by Jones during closing argument indicated that he was aware of the article and the conclusions reported therein. Specifically, during his closing, counsel stated that the Caterpillar Study was a cancer study involving welders and that it did not, as Dr. Eager testified, evaluate the effects of welding fumes on welders. Furthermore, the court reasoned that even if counsel did not know of the article when Dr. Eager testified at trial, counsel had every incentive to obtain and review the article as soon as possible to ensure that Dr. Eager had fairly conveyed its findings. Accordingly, the court concluded that the Caterpillar article was either known to Jones and his counsel at trial or could have been obtained, in the exercise of due diligence, in time to file a Rule 59 motion.
 
 
 106
 Finally, and most importantly, the district court concluded that a new trial without Dr. Eager's allegedly "false testimony" testimony would probably not produce a new result. The court first noted that Jones took much of the force away from Dr. Eager's testimony when he pointed out to the jury that Dr. Eager was neither a toxicologist nor an expert on matters of physiology. The court also found that Jones undermined Dr. Eager's testimony by reminding the jury that whatever findings Dr. Eager testified to regarding the toxic effect of welding fumes on lungs, it bore little relevance to Jones's claim of brain damage. Moreover, Jones's medical expert, Dr. Klawans, undercut the weight of Dr. Eager's testimony by testifying that medical research showed that manganese in welding fumes could lead to the onset of manganism by entering a welder's respiratory tract, being absorbed into the bloodstream, and traveling to the brain where it causes neurological damage. But most fundamentally, the district court found that the weakness in Jones's medical causation evidence was absolutely fatal to his claim against Defendants. The court noted that at least four physicians diagnosed Jones with idiopathic Parkinson's disease; whereas only Jones's expert determined that Jones suffered from manganism, and the court found that his testimony was "significantly undermined on cross-examination." Accordingly, the court concluded that Jones failed to prove that subtracting Dr. Eager's challenged testimony would probably change the outcome of the trial in light of what the physicians said at trial concerning the cause of Jones's condition.
 
 
 107
 On appeal, Jones contends that the district court abused its discretion in reaching each of these conclusions and, as a result, abused its discretion in denying his motion for a new trial. We review a district court's denial of a Rule 60(b)(2) motion for abuse of discretion. See Harris v. Owens-Corning Fiberglas Corp, 102 F.3d 1429, 1434 (7th Cir. 1996); Mares v. Busby, 34 F.3d 533, 535 (7th Cir. 1994). In the context of a motion for a new trial, we employ a highly deferential abuse of discretion standard under which we affirm the decision of the district court unless the movant can show that no reasonable person could agree with the court. See Harris, 102 F.3d at 1434; Mares, 34 F.3d at 535. "We especially are disinclined to substitute our judgment for that of the district court when the record affirmatively manifests that the matter received careful, thorough consideration by the district judge." Gomez v. Chody, 867 F.2d 395, 405 (7th Cir. 1989). After reviewing the district court's denial of Jones's Rule 60(b)(2) motion, we find no indication that the district court abused its discretion in denying Jones a new trial.
 
 
 108
 A detailed discussion of all of Jones's challenges is not warranted in light of our resolution of his claims that Dr. Eager's testimony on these matters was improperly admitted into evidence in the first place. That is, we need not address Jones's challenges to the district court's conclusions regarding his lack of diligence in discovering the alleged falsity of Dr. Eager's testimony relating to the Caterpillar Study, the falsity of Dr. Eager's testimony that he conducted "joint research" and published papers with Dr. Brain, and the falsity of Dr. Eager's testimony regarding the results reached by the Joint Research, because even if we assume that Jones acted with reasonable diligence and that Dr. Eager's testimony was likely false, we ultimately agree with the final and dispositive ground the court articulated as a basis for denying relief--the newly discovered evidence was not significantly material to the ultimate outcome of this case and Jones failed to show that subtracting this testimony from the trial would have probably resulted in a verdict in his favor. As we set forth above, in order to have a successful Rule 60(b)(2) motion, Jones had to prove that the newly discovered evidence "is such that a new trial would probably produce a new result." In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 78 F.3d at 294. The district court concluded that Jones failed to satisfy this requirement, and Jones offers no convincing argument on appeal that the district court abused its discretion in reaching this conclusion.
 
 
 109
 The testimony that Jones submits is materially false in his Rule 60(b)(2) motion is, for the most part, the same testimony that Jones objected to as being improperly admitted into evidence in the first place. In the context of ruling on his appeal of the district court's evidentiary rulings, we fully examined Jones's challenges to the admission of that testimony and concluded that any error by the court in admitting this evidence was harmless because the challenged testimony did not contribute to the verdict in a meaningful manner. Since our inquiry here into whether Jones's newly discovered evidence "would probably produce a different result" in a retrial is essentially the same as our harmless error inquiry, Jones's contention that subtracting Dr. Eager's allegedly false testimony with respect to these matters from the trial would probably result in a different outcome ultimately fails for the same reasons that we held that the admission of this testimony into evidence was harmless error.
 
 
 110
 Simply put, the outcome of this case turned on the issue of whether Jones suffered from idiopathic Parkinson's disease or manganism. The medical evidence introduced at trial showed that he suffered from idiopathic Parkinson's disease, and, therefore, evidence suggesting that welding fumes either could or could not lead to the onset of manganism was not terribly material nor relevant to the ultimate determination of Defendants' liability for Jones's neurological disorder. And since we have already concluded that the admission into evidence of the testimony that Jones now challenges as being false was harmless error, it would make little sense for us now to conclude that subtracting this testimony from trial would probably result in a verdict in Jones's favor in the context of Jones's Rule 60(b)(2) motion for a new trial.
 
 
 111
 Thus, given the weakness of Jones's case, we cannot say that the outcome of a retrial without Dr. Eager's testimony would probably produce a different result. Therefore, Jones's "newly discovered" evidence fails to satisfy all the necessary requirements under Rule 60(b)(2) to warrant the grant of a new trial. Accordingly, we conclude that the district court did not abuse its discretion in denying Jones's Rule 60(b) motion.
 
 
 112
 D. The District Court Did Not Err In Denying Jones's Motion To Hold Dr. Eager In Contempt
 
 
 113
 Jones's final challenge is that the district court erred in denying his motion for a rule to show cause why Dr. Eager should not be held in contempt of court for providing false testimony at trial. Based on the same allegations spelled out above, Jones moved the court to hold Dr. Eager liable in civil contempt and to recover from Dr. Eager all of the costs incurred by Jones in connection with the prosecution of his case, the legal expenses of preparing for and conducting a second trial, and a civil fine. In addition, Jones sought disgorgement of the expert witness fees Defendants paid to Dr. Eager for his time spent in connection with this case. While Dr. Eager vigorously argued that he testified truthfully at trial and that Jones's allegations were based upon selective and out-of context quotations from testimony elicited in a subsequent unrelated proceeding, the district court did not reach the truthfulness of Dr. Eager's testimony in denying Jones's contempt motion.[9]
 
 
 114
 Instead, the court denied Jones's motion on the ground that the nature and purpose of civil contempt does not warrant applying it to a witness who testifies falsely at trial. The court ruled that even assuming Jones's allegations were true, the mere provision of false or perjurious testimony does not constitute civil contempt without some added showing that the testimony obstructed the court's authority to conduct orderly proceedings or perform its duties. The court reasoned that to be subject to civil contempt, Dr. Eager must have disobeyed an explicit court order or must have otherwise defied or obstructed the court's authority to conduct orderly proceedings. The court found that Dr. Eager's testimony, even if false, failed to satisfy this standard for three reasons. First, the court never ordered Dr. Eager to testify truthfully. Although witnesses swear an oath to testify truthfully at trial, this oath is not tantamount to a court order. Second, since the essential function of a trial is "truth-finding," the provision of false testimony at trial could not be said to significantly impede that function. The court reasoned that by their very nature, trials contain conflicting and oftentimes diametrically opposed testimony; however, this does not ordinarily affect a court's ability to conduct orderly trials. Third, the court reasoned that an essential justification for the measure of civil contempt is to give courts a tool for forcing obedience to their orders. The court could not order Dr. Eager to come back and testify "truthfully" thereby restoring "order" to a trial that was already concluded. Based on these grounds, the court denied Jones's motion to hold Dr. Eager in contempt.
 
 
 115
 On appeal, Jones contends that the court erred in requiring that Jones prove, in addition to showing that Dr. Eager testified falsely, the additional element that his testimony obstructed justice. Jones submits that the added "obstruction of justice" requirement is only applicable to criminal contempt proceedings and that federal courts have held that testifying falsely is, in and of itself, a sufficient basis for a finding of civil contempt. Jones also believes that the district court's ruling essentially leaves him without any remedy for the harm caused by Dr. Eager's false testimony. For these reasons, Jones argues that the district court's order should be reversed.
 
 
 116
 We review the district court's denial of Jones's contempt motion under an abuse of discretion standard. Stotler and Co. v. Able, 870 F.2d 1158, 1163 (7th Cir. 1989). "A district court's decision on a contempt petition is discretionary in character and is not to be reversed except for abuse of such discretion or unless clearly erroneous." Id. (internal quotation marks and citations omitted). Upon close review, we find Jones's arguments to be without merit and affirm the decision of the district court.
 
 
 117
 A court's civil contempt power rests in its inherent limited authority to enforce compliance with court orders and ensure judicial proceedings are conducted in an orderly manner. See e.g., D. Patrick, Inc. v. Ford Motor Co., 8 F.3d 455, 459 (7th Cir. 1993); Ferrell v. Pierce, 785 F.2d 1372, 1378 (7th Cir. 1986). To hold a party or witness in civil contempt, "the district court must be able to point to a decree from the court which 'set[s] forth in specific detail an unequivocal command' which the party [or witness] in contempt violated." Ferrell, 785 F.2d at 1378 (quoting H.K. Porter Co. v. National Friction Prods., 568 F.2d 24, 27 (7th Cir. 1977)). Civil contempt proceedings are coercive and remedial, but not punitive, in nature and sanctions for civil contempt are designed to compel the contemnor into compliance with an existing court order or to compensate the complainant for losses sustained as a result of the contumacy. See International Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 826-28 (1994); Connolly v. J.T. Ventures, 851 F.2d 930, 932 (7th Cir. 1988).
 
 
 118
 Thus, civil contempt proceedings may be classified into two categories. Coercive sanctions, which are really the essence of civil contempt, seek to induce future behavior by attempting to coerce a recalcitrant party or witness to comply with an express directive from the court. See Latrobe Steel Co. v. United Steelworkers of Am., AFL-CIO, 545 F.2d 1336, 1344 (3rd Cir. 1976). Remedial sanctions, by contrast, are backward-looking and seek to compensate an aggrieved party for losses sustained as a result of the contemnor's disobedience of a court's order or decree made for the aggrieved party's benefit. See id. However, irrespective of the nature of the civil contempt, whether it be coercive or remedial, any sanction imposed by the court must be predicated on a violation of an explicit court order. See Ferrell, 785 F.2d at 1378; see also Boylan v. Detrio, 187 F.2d 375, 378-79 (5th Cir. 1951).
 
 
 119
 Jones's contempt motion obviously cannot be characterized as "coercive" in nature because his trial is over, and, therefore, the court could not seek to cure the alleged violations by ordering Dr. Eager to return and testify "truthfully" under the threat of contempt sanctions. Therefore, if Jones's allegations of false swearing are to constitute civil contempt, which they do not, the only relief that the court could grant is remedial to compensate Jones for any damage caused by Dr. Eager's perceived disobedience. However, Jones's claim for remedial relief necessarily fails because he cannot show that Dr. Eager disobeyed the court's authority in any manner that justifies the imposition of civil contempt sanctions. As the district court stated in its decision, "this Court never ordered Dr. Eager to testify truthfully. Granted Dr. Eager swore to do so, but that oath does not amount to an order of the Court." The remedial relief contemplated by civil contempt is to compensate the aggrieved party for losses sustained as a result of the contemnor's non-compliance with an existing court order. Dr. Eager violated no court decree ordering him to take or not to take certain action. In the absence of such an order, and any conduct in violation thereof, we cannot say that the court erred in denying Jones's contempt motion.
 
 
 120
 Moreover, contrary to Jones's position on appeal, our review of relevant authority makes clear, in a manner consistent with the district court's holding, that civil contempt is an improper method by which to punish perjurious or false testimony absent some element of obstruction of justice. See Ex parte Hudgings, 249 U.S. 378, 383-84 (1919); see also Sigety v. Abrams, 632 F.2d 969, 976 (2d Cir. 1980) ("As broad as the power of civil contempt may be, it does not include the power to punish for the crime of perjury . . . ."). In Ex parte Hudgings, the trial court held a witness in contempt for refusing to testify truthfully at trial and ordered the witness committed into custody until he purged himself of the contempt for which he was being punished. See 249 U.S. at 381-82. The issue placed before the Supreme Court was whether the "power to punish for contempt exists in every case where a court is of the opinion that a witness is committing perjury." Id. at 382. The Court held that a witness could not be held in contempt for perjury unless it be shown that some further element of obstructing the court's authority be proven. See id. at 383-84. The Court explained:
 
 
 121
 An obstruction to the performance of judicial duty resulting from an act done in the presence of the court is . . . the characteristic upon which the power to punish for contempt must rest. This being true, it follows that the presence of that element must clearly be shown in every case where the power to punish for contempt is exerted--a principle which, applied to the subject in hand, exacts that in order to punish perjury in the presence of the court as a contempt there must be added to the essential elements of perjury under the general law the further element of obstruction to the court in the performance of its duty.
 
 
 122
 Id. at 383. In reaching this conclusion, the court rejected earlier decisions that treated perjury without any other element as adequate to sustain a contempt finding, reasoning that those cases either overlooked or misconceived the essential characteristic of the obstructive tendency underlying the court's contempt power, or mistakenly attributed a necessarily obstructive effect to false swearing. See id. at 383-84. If either of those rationales were in fact true, the Court reasoned, then
 
 
 123
 it would follow that when a court entertained the opinion that a witness was testifying untruthfully the power would result to impose a punishment for contempt with the object or purpose of exacting from the witness a character of testimony which the court would deem to be truthful; and thus it would come to pass that a potentiality of oppression and wrong would result and the freedom of the citizen when called as a witness in court would be gravely imperiled.
 
 
 124
 Id. at 384.
 
 
 125
 In In re Michael, 326 U.S. 224 (1945), the Supreme Court reaffirmed this principle that false testimony alone does not produce the obstruction of the court's authority necessary to satisfy holding a party or witness in contempt:
 
 
 126
 All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. Therefore it cannot be denied that it tends to defeat the sole ultimate objective of a trial. It need not necessarily, however, obstruct or halt the judicial process. For the function of trial is to sift the truth from a mass of contradictory evidence, and to do so the fact finding tribunal must hear both truthful and false witnesses. It is in this sense, doubtless, that this Court spoke when it decided that perjury alone does not constitute an "obstruction" which justifies exertion of the contempt power and that there "must be added to the essential elements of perjury under the general law the further element of obstruction to the Court in the performance of its duty."
 
 
 127
 Id. at 227-28 (quoting Ex parte Hudgings, 249 U.S. at 383-84).
 
 
 128
 In the instant case, Jones's contempt motion made no allegation of any obstructive element other than Dr. Eager's false testimony. Without the presence of some obstructive action on the part of Dr. Eager, the authorities cited above clearly indicate that the district court lacked the authority to hold him in civil contempt and Jones cites no persuasive authority to the contrary. See also Boylan, 187 F.2d at 378 (reasoning that acts of false swearing or perjury, standing alone, are insufficient to constitute civil contempt); United States v. Goldstein, 158 F.2d 916, 920 (7th Cir. 1947) ("Perjury by a witness has been thought to be not enough where the obstruction to judicial power is only that inherent in the wrong of testifying falsely. . . . For offenses of that order the remedy by indictment is appropriate and adequate." (quoting Clark v. United States, 289 U.S. 1, 11 (1933))).
 
 
 129
 Indeed, to hold a witness liable in money damages merely because he or she testified falsely at trial would violate the long-standing common law rule that parties and witnesses are immune from subsequent damages liability for their testimony in judicial proceedings. See Briscoe v. LaHue, 460 U.S. 325, 332-36 (1983); Butz v. Economou, 438 U.S. 478, 512 (1978). Instead, the proper recourse against a witness who testifies falsely at trial is a subsequent prosecution for perjury. See, e.g., In re Kitchen, 706 F.2d 1266, 1274-75 (2d Cir. 1983) ("[A] witness who testifies falsely is ordinarily subject to prosecution for a criminal offense, e.g., perjury, but not to sanctions for civil contempt.").
 
 
 130
 Finally, it cannot be said that Jones lacked an adequate remedy to redress his claim that Dr. Eager testified falsely at trial. Jones filed a Rule 60(b)(2) motion for a new trial based on Dr. Eager's allegedly false trial testimony. The possibility that Jones could have received a new trial on the basis of these allegations of perjury, if proven, is a sufficient and adequate remedy for any harm that might have been caused by Dr. Eager's trial testimony.
 
 III. Conclusion
 
 131
 For the foregoing reasons, the jury verdict and the orders of the district court are AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The Honorable Walter J. Cummings participated in oral argument and consideration of this case, however, he died on April 24, 1999.
 
 
 [1]
 The district court entered a directed verdict in favor of Inco Alloys International, Incorporated at the close of Jones's case-in-chief. Jones does not appeal this ruling and Inco is not a party to this appeal.
 
 
 [2]
 Although Dr. Shannon was unaware of Jones's manganese exposure when she conducted her examinations, she testified that a patient's history of exposure to manganese would only be relevant to the determination of the cause of a patient's Parkinsonism if she found that the patient exhibited atypical features suggesting that the patient did not suffer from idiopathic Parkinson's disease.
 
 
 [3]
 Jones had been living in the Las Vegas area for several years, but had been traveling back to Chicago for work.
 
 
 [4]
 Dr. Olanow specializes in neurology at Mount Sinai Medical Center in New York City, with a subspecialty in movement disorders, which includes Parkinson's disease and other related disorders that cause patients to have involuntary or slowed movements.
 
 
 [5]
 Dr. Klawans specializes in neurology at Rush- Presbyterian St. Luke's Medical Center in Chicago. Like Dr. Olanow, Dr. Klawans's subspeciality is movement disorders.
 
 
 [6]
 Although Jones also objected to Dr. Eager's testimony regarding the Joint Research on Rule 26 grounds on the morning following the admission of this testimony into evidence, this objection is not material to our resolution of his claims on appeal and, therefore, we need not determine whether this belated objection was properly preserved for appeal.
 
 
 [7]
 Defendants maintain that Dr. Eager did not render any "opinion" testimony but merely reported the conclusions reached by the Joint Research. Since he participated in the Joint Research and discussed the findings generated by that research in a reciprocal exchange of information with Dr. Brain and others involved in the research project, Defendants submit that the district court did not abuse its discretion in allowing Dr. Eager to summarize the Joint Research's findings. Any questions regarding the methodology and conclusions reached by the Joint Research, Defendants believe, could be appropriately addressed during cross-examination. While Dr. Eager may have had personal knowledge of the findings of the Joint Research, Defendants' argument ignores the fact that Dr. Eager did not have the necessary background to fully explain how those conclusions were reached. Without such background, we fail to see how cross-examination could realistically have challenged the methodology employed by or the conclusions reached by the Joint Research.
 
 
 [8]
 Dr. Antonini was a research fellow responsible for conducting the day-to-day laboratory work in connection with the Joint Research.
 
 
 [9]
 In light of the district court's subsequent order denying Jones's Rule 60(b)(2) motion analyzed above, it appears that the court concluded that the bulk, if not all, of Dr. Eager's challenged trial testimony was not materially false. However, because the court did not reach this issue in denying Jones's contempt motion, relying instead on the lack of legal foundation for holding a party in contempt solely on the basis of providing false testimony at trial, we will contain our review of whether the court erred in denying his contempt motion to this ground.