# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-1352

MARCUS & MILLICHAP INVESTMENT SERVICES
OF CHICAGO, INC.,

*Plaintiff/Counter-Defendant-Appellee,*

*v.*

TONY SEKULOVSKI,

*Defendant/Counter-Plaintiff-Appellant.*

*v.*

MARCUS & MILLICHAP REAL ESTATE INVESTMENT
SERVICES, INC.,

*Counter-Defendant-Appellee,*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 5369—**Harry D. Leinenweber**, *Judge.*

ARGUED SEPTEMBER 8, 2010—DECIDED MARCH 23, 2011

Before EASTERBROOK, *Chief Judge,* and BAUER and
KANNE, *Circuit Judges.*

KANNE, *Circuit Judge*.  Real estate commercial brokerage Marcus & Millichap Real Estate Investment Services, Inc. ("REIS"), and its Illinois-based subsidiary, Marcus & Millichap Real Estate Investment Services of Chicago, Inc. ("M&M Chicago"), sued former agent Tony Sekulovski for breach of contract, unjust enrichment, conversion, fraud, and tortious interference. These claims were based on allegations that Sekulovski fraudulently misrepresented the work he and his partner contributed to various real estate transactions and that he misappropriated transactions and commissions when he terminated his relationship with the brokerage. Sekulovski counterclaimed for breach of contract, declaratory relief, unjust enrichment, and unlawful withholding of wages. At the end of the parties' presentation of evidence, the district court entered a judgment as a matter of law in favor of M&M Chicago on Sekulovski's statutory wage claim. The jury then found in M&M Chicago's favor on all counts. The district court denied Sekulovski's motions for a judgment as a matter of law or, alternatively, for a new trial on each count. Because we find that the district court did not err in its rulings, we affirm.

## I. BACKGROUND

Sekulovski began working with REIS in 1999 as a real estate agent for its Ohio subsidiary, M&M Ohio. REIS pools some administrative resources at the national level, providing ongoing access to all of its independent contractors regardless of location. But each REIS subsidiary operates as a distinct legal entity to comply

with state licensing laws and enters into salesperson agreements with agents it hires as independent contractors. Each agreement must incorporate REIS's Independent Contractor Policy Manual ("Policy Manual"), and agents' continued affiliation with REIS depends upon their compliance with its requirements.

Sekulovski transferred to M&M Chicago in 2005, terminating his relationship with M&M Ohio. Sekulovski availed himself of REIS resources while working in Chicago. Yet despite Sekulovski "hanging his license" with M&M Chicago and REIS's policy requiring independent contractor agreements, Sekulovski never signed a written salesperson agreement with M&M Chicago. At trial, Sekulovski stated that he had an oral agreement with M&M Chicago that established his compensation schedule, but he admitted to no other details of his agency relationship. M&M Chicago argued its arrangement with Sekulovski—whether oral or implied—incorporated the Policy Manual.

REIS's independent contractors do not earn salaries, but receive commissions at the conclusion of real estate transactions. The commissions are divided between the subsidiary (throughout this case, M&M Chicago) and the agent or agents involved in the transaction. Until an agent meets a certain sales threshold each year, the commission is divided evenly between M&M Chicago and the agent. Once a senior agent reaches an annual threshold, however, the agent's share increases on a graduated scale up to seventy percent of the commission. If more than one agent is involved in a transaction,

they submit a booking statement to M&M Chicago identi-fying the agents involved and allocating the amount of work accomplished by each. For example, the booking statement may show that Agent A performed two-thirds of the work and Agent B contributed one-third of the work to the transaction. The agents themselves agree to the allocations; M&M Chicago generally approves the arrangement without scrutiny, provided it is in writing. If one agent is compensated on the graduated scale and the other divides his share with M&M Chicago evenly, each receives a portion of the overall commission that reflects both the allocated work effort and the com-pensation scale.[1]

Mark Luttner—a contractor Sekulovski had mentored and supervised at M&M Ohio—followed Sekulovski to M&M Chicago. The two began an informal partnership in which they collaborated as real estate agents. At times they spoke of leaving REIS and forming their own real estate brokerage firm, though that plan never reached fruition. They initially split their commissions evenly, but in September 2006—when Sekulovski reached the graduated scale for the year—they began to change their

---

[1] For example, assume Agent A has reached the 70% cap on his sales and Agent B has not reached the graduated scale. If each agent contributed the same amount of work to a deal generating a $100,000 commission, the booking statement would allocate 50% of the work to each agent. Agent A would receive $35,000 (50% of work * 70% share * $100,000), Agent B would receive $25,000 (50% of work * 50% share * $100,000), and M&M Chicago would retain $40,000.

booking statement allocations. Over the course of seventeen deals at issue in this case, Sekulovski claimed a 75-100% share of the commissions in his joint transactions with Luttner. When M&M Chicago began investigating the change, Sekulovski stated that his relationship with Luttner had deteriorated and that Luttner's share was reduced to reflect Luttner's lack of contributed work. M&M Chicago claims that Sekulovski convinced Luttner to approve the diminished or eliminated allocation by giving Luttner a kick-back after he received the commission; this arrangement would allow both Sekulovski and Luttner to receive a greater share at M&M Chicago's expense.[2]

Sekulovski resigned from M&M Chicago in June 2007, but he was unable to reach an agreement with M&M Chicago regarding distribution of commissions from his pending transactions. In apparent contravention of state law and the Policy Manual, Sekulovski directed a title company to pay two commissions to him rather than to the brokerage. He also affiliated with NAI Horizon (another national brokerage firm in Arizona), but continued to represent some clients with whom he had worked while at M&M Chicago. As a result, some

---

[2] In contrast to the example in footnote 1, assume the booking statement allocated 100% of the work to Agent A. M&M Chicago would then retain only $30,000 of the $100,000 commission, while Agent A would receive $70,000. Agent A could then "kick back" $30,000 to Agent B, leaving each agent with $5,000 more than if they had submitted a truthful booking statement.

transactions that commenced while Sekulovski had "hung his license" with M&M Chicago closed while he was with NAI Horizon. Sekulovski retained commissions from these transactions. M&M Chicago protested that those deals belonged to it, as the Policy Manual stated that "any and all employment of any kind or nature whatsoever by a salesperson in connection with the real estate business must be taken in the name of the firm." M&M Chicago later asked one closing party to hold its commission payment in escrow until the controversy was resolved, rather than paying the commission to Sekulovski directly.

In order to resolve the continuing dispute, REIS and M&M Chicago sued Sekulovski in the U.S. District Court for the Northern District of Illinois. The parties stipulated to a dismissal of REIS's claims before trial, so it is a party to this appeal only as a Counter-Defendant-Appellee. M&M Chicago sought damages based on breach of contract, unjust enrichment, conversion, fraud, and tortious interference theories. Sekulovski brought counterclaims for breach of contract, unjust enrichment, unlawful withholding of wages, and tortious interference with contract. Luttner testified on M&M Chicago's behalf at trial, stating that he and Sekulovski agreed to misrepresent allocations in booking statements in order to maximize their take. The jury received other evidence of the scheme, including emails purportedly exchanged between Luttner and Sekulovski confirming the kickback amounts. Sekulovski introduced bias evidence to impugn Luttner's credibility, but the district court excluded additional evidence Sekulovski proffered to further impeach him.

The district court granted M&M Chicago's motion for a judgment as a matter of law on Sekulovski's statutory wage claim at the conclusion of the evidence. A jury then rendered verdicts in favor of M&M Chicago on each of its claims and against Sekulovski on each of his remaining claims. The district court entered judgment on those verdicts and subsequently denied Sekulovski's post-trial motions for a judgment as a matter of law or, in the alternative, for a new trial on each claim. Sekulovski timely appealed the district court's final judgment.

## II. ANALYSIS

Sekulovski "hung his license" with M&M Chicago for over two years, using REIS staff and resources in his work. He claims to have had an oral agreement with M&M Chicago establishing a compensation schedule, but also argues that no contract governed their relationship because he never signed a new representation agreement after he moved to Chicago. His inconsistent arguments notwithstanding, we find that a contract clearly existed between Sekulovski and M&M Chicago. *See Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 726 (7th Cir. 2010) (contract may be implied from the parties' conduct). Nothing in the record reasonably suggests that Sekulovski and M&M Chicago were not in a contractual relationship or that they did not expect the terms of the Policy Manual to govern their interactions, even in the absence of a signed agreement to that effect. With this implied-in-fact contract in mind, we turn to Sekulovski's articulated issues.

Sekulovski presents seven discrete issues with many subparts. Apparently he hoped that at least one of his buckshot arguments—which often stray from his identified issues—would lead to reversal. We group his allegations of error into four categories: evidentiary rulings, jury instructions, application of the Illinois Wage Payment and Collections Act, and denial of post-trial motions. We will analyze each category in turn.

## A. Evidentiary Rulings

Sekulovski argues that the district court erred by limiting his cross-examination of Luttner and by excluding evidence allegedly demonstrating Luttner's bias. He contends that these rulings prejudiced him because the case turned on Luttner's credibility. He alleges the district court erred in preventing the introduction of or restricting Sekulovski's cross-examination about six categories of bias evidence, including a post-trial email purportedly showing that Luttner perjured himself during his deposition.

We generally defer to district courts' evidentiary decisions. When a party appeals a district court's decisions to exclude evidence as erroneous, we will not overturn the court's decisions unless the court abused its discretion. *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 440 (7th Cir. 2009). The same standard applies to our review of a district court's decisions to limit the scope of cross-examination. *Cruz v. Safford*, 579 F.3d 840, 844 (7th Cir. 2009). We will disturb the district court's challenged evidentiary rulings only if "no reasonable person could

take the view adopted by the trial court.*" Suarez v. Town of Ogden Dunes, Ind.*, 581 F.3d 591, 598 (7th Cir. 2009).

Sekulovski is correct that evidence of a witness's bias or motive to lie is generally admissible for impeachment, *United States v. Abel*, 469 U.S. 45, 50-51 (1984), and that bias is a particularly appropriate topic for cross-examination, *United States v. Salem*, 578 F.3d 682, 686 (7th Cir. 2009). But Sekulovski argues for a *per se* rule of admissibility where the proponent of evidence seeks to prove bias. We have repeatedly held to the contrary. Proffered bias evidence is subject to both the Federal Rules of Evidence and the discretion of the trial court. *United States v. Frankenthal*, 582 F.2d 1102, 1106-07 (7th Cir. 1978). "Proof of bias" is not a talismanic phrase that extinguishes the trial court's duty to evaluate and possibly exclude evidence otherwise violative of the Rules. Regardless of the importance of bias evidence, "the trial court has considerable discretion as to how and when bias may be proved and as to what collateral evidence for purposes of impeachment is material." *United States v. Higgins*, 362 F.2d 462, 464 (7th Cir. 1966).

Sekulovski seeks support for his *per se* rule from *Crowe v. Bloduc*, 334 F.3d 124 (1st Cir. 2003), but his reliance is misplaced. In that case, the First Circuit considered whether the district court abused its discretion when it limited cross-examination of a witness on his contingency fee arrangement—a bias inquiry the First Circuit found to be vital. *Id.* at 132 (*citing United States v. Valona*, 834 F.2d 1334, 1343 (7th Cir. 1987)). The *Crowe* court ultimately held that it was not an abuse of discretion

to limit cross-examination of even witness bias pursuant to Rule 403. *Id.* at 134.

We likewise find that the district court did not abuse its discretion in its evidentiary decisions in this case. The court properly applied the Federal Rules of Evidence, ruling that some of the proffered evidence was of little or no probative value, that its value would be substantially outweighed by risk of confusion or wasted time, and that much of the evidence constituted inadmissible hearsay. In his opening brief, Sekulovski never addressed—let alone refuted—the district court's Rule 401, 403, and 802 analyses. Only in his reply brief does Sekulovski argue the propriety of any evidentiary holding, and even if this abortive attempt had any merit—which it did not—it would have been too late. *See Bodenstab v. County of Cook*, 569 F.3d 651, 658 (7th Cir. 2009). Regardless, a reasonable person could take the well-reasoned view adopted by the district court, so none of its challenged evidentiary rulings were erroneous.

Sekulovski's ultimate argument is that the cumulative effect of these evidentiary decisions was to prejudice the jury because he was unable to attack Luttner's credibility *ad nauseam*. The district court did note that Luttner's credibility was at issue in the trial, but correctly concluded that it was quite unlikely that the jury found Luttner's truthfulness untarnished even in the absence of Sekulovski's proffered evidence. Sekulovski presents a false dichotomy by assuming that the jury would believe either him or Luttner. He fails to acknowledge the very likely possibility that the jury found neither of

them credible and pieced together its own version of events based on corroborations and reasonable inferences. The district court admitted redacted emails clearly demonstrating Luttner's hostility toward Sekulovski, and the jury heard testimony from each party alleging that the other's witness fabricated documents. As we noted in similar circumstances, "the jury had the benefit of knowing that each party charged the other with wrongdoing so that the claimed basis for bias was evident. . . . We, therefore, do not view the judge's exercise of discretion to have been an abuse of sound judgment." *United States v. Draiman*, 784 F.2d 248, 257-58 (7th Cir. 1986).

Sekulovski's last challenge regarding excluded evidence was that Luttner's post-trial email—which M&M Chicago contends was fabricated by Sekulovski—militated a new trial, especially in light of the other excluded evidence. We will consider this challenge in our separate discussion of his post-trial motions.

### B. Jury Instructions

In his second salvo, Sekulovski contends that he is entitled to a new trial because the district court improperly instructed the jury on two points of law. We review challenged instructions to determine whether "the instructions as a whole were sufficient to inform the jury of the applicable law," and reverse "only if an instruction so misled the jury that the deficiency prejudiced the defendants." *Fox v. Hayes*, 600 F.3d 819, 843 (7th Cir. 2010).

First, Sekulovski asserts that the court gave erroneous instructions regarding the jury's calculations of fraud damages. He argues that the district court should have instructed the jury to discount from any damage award the amount M&M Chicago would have been required to pay Luttner had the fraud not occurred. He also argues that the court should not have precluded him from introducing evidence of those hypothetical amounts. He reasons that, because they would not have been legally retained by M&M Chicago, those amounts should not have been considered as a part of M&M Chicago's loss.

Under Illinois law, "damage awards for fraud are based upon the plaintiff's loss (rather than the defendant's gain)." *LM Ins. Corp. v. Spaulding Enters. Inc.*, 533 F.3d 542, 554 (7th Cir. 2008). The Illinois Supreme Court has explained that the "plaintiff's loss" shorthand for damages computation is "based on the rationale that the defrauded party is entitled to be placed in the same financial position he would have occupied had the misrepresentations in fact been true." *Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 56 (Ill. 2005). Yet the Illinois cases giving rise to the "plaintiff's loss" aphorism generally involved consumer fraud, not the kind of misrepresentation involved in the present case. *See Giammanco v. Giammanco*, 625 N.E.2d 990, 998 (Ill. App. Ct. 1993) ("The . . . rule best fits the most common fraud scenario where a buyer . . . has been misled about the quality of property or some other matter relevant to a pecuniary aspect of the transaction.").

Here, Sekulovski's misrepresentation did not induce REIS to contract with him, but rather induced REIS

to over-compensate him pursuant to his contract terms. Sekulovski's narrow, superficial interpretation of the "plaintiff's loss" measure thus does not provide a fitting template for the circumstances of his specific case. His interpretation would allow him to retain any portion of the overall commissions that hypothetically would have gone to Luttner, as if those portions were not a loss to the brokerage occasioned by his misrepresentations.

The district court was not obligated to adopt Sekulovski's interpretation of the "plaintiff's loss" measure if adopting it would lead to nonsensical results. *See id.* at 1001 (noting that general damage measures "are only guides to common sense to begin with" and that the benefit-of-the-bargain and out-of-pocket measures are not always perfect litmus tests for compensable damages). We agree with the district court that the proper measure of damages in this case was the amount that Sekulovski received in commissions to which he would not have been entitled but for his fraud. Accordingly, the district court did not err in instructing the jury on this point.

Whether M&M Chicago may rightfully retain the full amount of that overpayment after recovering it from Sekulovski—that is, whether it would be somehow obligated to remit a portion of that amount to Luttner—is irrelevant to the issue of how much Sekulovski caused the brokerage to overpay him through his fraudulent representations. That the defrauded party may have had other financial obligations does not alter the impact of the tortfeasor's act or justify his retention of the dif-

ference between the proposed damage measures. *See Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 538 N.E.2d 530, 538 (Ill. 1989) (noting that how defrauded parties subsequently dealt with other liabilities after recovery was irrelevant to the damages calculation). The district court, therefore, did not err in excluding evidence of how much REIS would have paid Luttner had Sekulovski not misrepresented the true nature of their joint participation in the real estate deals.

Second, Sekulovski asserts that the court erroneously instructed the jury regarding M&M Chicago's tortious interference claim. In a perfunctory three-sentence paragraph, he suggests that the district court erroneously instructed the jury on Illinois real estate licensing requirements and that this error misled the jury as to his relationship with M&M Chicago. At trial, he argued that simply having hung his license at M&M Chicago did not give M&M Chicago an automatic interest in deals he began working during that period and that the licensing law was, therefore, not applicable to the case. The court responded that it found the statute pertinent because it bore on M&M Chicago's interest in certain real estate deals on which Sekulovski worked while at the brokerage.

The statute at issue—which Sekulovski never identifies in his brief—is 225 Ill. Comp. Stat. 454/10-20(a): "A [real estate] licensee may perform activities as a licensee only for his or her sponsoring broker. A licensee must have only one sponsoring broker at any one time." At no point in his opening brief does Sekulovski explain how the

instruction was misleading or why the district court's assessment of the statute's pertinence was incorrect. Although he endeavors to provide at least some analysis in his reply brief by arguing that the statutory scheme does not allow for private enforcement of its requirements—a point irrelevant to the district court's instruction—his arguments arrive too late to avoid waiver of this issue on appeal. *See Bodenstab*, 569 F.3d at 658.

We conclude that the district court correctly determined that this statute, while not dispositive of M&M Chicago's interest in the disputed transactions, could bear on the jury's assessment of that interest. Sekulovski's perfunctory and undeveloped argument fails to convince us that the instruction "so misled the jury that [any] deficiency prejudiced" him. *Fox*, 600 F.3d at 843. The district court sufficiently informed the jury of the law applicable in this case. Because neither of his instructional error claims have merit, Sekulovski is not entitled to a new trial based on the jury instructions.

## C. *Illinois Wage Act*

Sekulovski's third category of alleged error involves the district court's determination that he would be classified as an independent contractor, as opposed to an employee, under the Illinois Wage Collection and Payment Act, 820 Ill. Comp. Stat. 115/1, *et seq.* ("Wage Act"). We have previously recognized that "[t]his exclusion is designed to distinguish between protected employees and independent contractors, who are not pro-

tected." *Adams v. Catrambone*, 359 F.3d 858, 862 n.4 (7th Cir. 2004).

The Wage Act's purpose is to "protect[] employees in Illinois from being stiffed by their employers." *Glass v. Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998). Although the Wage Act's definition of "employee" is broad, the definition "does narrow the statute's applicability by denying recovery to those who are, essentially, independent contractors." *Landers-Scelfo v. Corporate Office Sys., Inc.*, 827 N.E.2d 1051, 1058 n.1 (Ill. App. Ct. 2005) (discussing 820 Ill. Comp. Stat. 115/2). Sekulovski would not be M&M Chicago's "employee" if (1) M&M Chicago did not exert control and direction over the performance of his work, (2) he performed his work outside all of M&M Chicago's places of business, and (3) he was in an independently established trade, occupation, profession or business. *Id.* "These requirements are to be read in the conjunctive." *Id.*

Sekulovski claimed that M&M Chicago owed him commissions that it withheld and that the Wage Act applied to his relationship with M&M Chicago. Both Sekulovski and M&M Chicago presented extensive evidence and arguments to the district court regarding the appropriate classification of Sekulovski's working relationship. At the conclusion of the evidence, M&M Chicago moved for a judgment as a matter of law on Sekulovski's Wage Act claims. The district court granted the motion, finding that Sekulovski was not a protected party under the Wage Act. The jury's verdicts then showed that Sekulovski was not entitled to any of the

commissions forming the basis of his Wage Act claims. In his opening brief, Sekulovski argues in the alternative that the district court misconstrued the Wage Act and that the district court's finding that he was outside the Wage Act's protection was against the manifest weight of the evidence.

We review a district court's interpretation of state statutes, such as the Wage Act, *de novo*. *Rexam Beverage Can Co. v. Bolger*, 620 F.3d 718, 724 (7th Cir. 2010). There must, however, be an interpretation to review. At no point in his opening brief does Sekulovski allude to any construction of the statute by the district court, let alone any interpretation that might conflict with state or circuit precedent. By failing to argue any dispute regarding the rule of law in his opening brief and by failing to develop any such argument even in his reply brief, Sekulovski has waived this line of argument.[3] *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704-05 (7th Cir. 2010). We thus proceed with our analysis presuming that the district court applied a correct interpretation of the Wage Act.

Sekulovski's actual grievance, put succinctly, is that the district court determined that he was an independent

---

[3] In his reply brief, Sekulovski alleges the "narrow construction of the Wage Act adopted by the district court . . . is not consistent with Illinois law." (Appellant's Reply Br. at 23.) Yet he does not explain how the district court narrowly construed the Act's language or how its view of the independent contractor exception did not comport with Illinois law.

contractor. We review *de novo* a district court's grant of a motion for a judgment as a matter of law, reversing if the evidence and permissible inferences could sustain a verdict in favor of the non-moving party. *Harbor Motor Co., Inc. v. Arnell Chevrolet-Geo, Inc.*, 265 F.3d 638, 644 (7th Cir. 2001). Classifying Sekulovski as either an employee or independent contractor involves a determination of fact, and the district court appeared to rely on that determination as its sole ground for granting M&M Chicago's motion for a judgment of law. That ruling would only have been appropriate if there was no legally sufficient basis for the jury to find that Sekulovski was an employee. Fed. R. Civ. P. 50(a); *Zimmerman v. Chicago Bd. of Trade*, 360 F.3d 612, 623 (7th Cir. 2004).

We agree with the district court's conclusion that Sekulovski was clearly an independent contractor under the Wage Act. He used the independent contractor title pervasively in his pleadings and briefs; he sought identification as an employee only when it might be profitable to do so; and, on balance, the totality of the evidence heavily suggests that he meets each of the conjunctive statutory factors for exclusion from the Wage Act. Yet our *de novo* review requires us to apply the standard for granting a motion for judgment as a matter of law rather than rest on our own view of contested evidence. *See Zimmerman*, 360 F.3d at 623. We instead ask whether the evidence, viewed in the light most favorable to Sekulovski with all reasonable inferences drawn in his favor, would have supported a jury's conclusion that Sekulovski was an employee.

Because the three prongs of the independent contractor exception are to be read in the conjunctive, *Landers-Scelfo*, 827 N.E.2d at 1058 n.1, M&M Chicago must have demonstrated that no reasonable jury could determine that Sekulovski fell outside of *any* of them. We easily conclude that a reasonable jury could not have found in Sekulovski's favor on the first or third prongs.[4] But the second prong gives us pause. The district court relied heavily on the fact that the vast majority of Sekulovski's work activities occurred away from the actual offices of M&M Chicago. But the Illinois Appellate Court—whose opinions have persuasive force in cases turning on Illinois law, *Adams*, 359 F.3d at 862—has explained that under the Wage Act "[a]n employer's place of business is not limited only to its own home offices, but can extend to any location where workers regularly represent an employer's interest." *Novakovic*, 820 N.E.2d at 669. A jury might reasonably determine that Sekulovski was representing M&M Chicago's interests while working despite his infrequent office presence, and

---

[4] M&M Chicago did not have statutory "control" over Sekulovski, as "control means that the employer has the right to control and direct the worker, not only as to the work to be done, but also as to how it should be done, whether or not that control is in fact exercised." *Novakovic v. Samutin*, 820 N.E.2d 967, 974 (Ill. App. Ct. 2004). Sekulovski clearly was also in an independently established trade, occupation, profession, or business, as evidenced by the fact that his work was potentially—and in fact later became—a freestanding enterprise. *Landers-Scelfo*, 827 N.E.2d at 1058 n.1.

striking real estate representation deals was well within M&M Chicago's usual course of business. Accordingly, the district court may have erred in granting M&M Chicago's Rule 50(a) motion based on its determination that Sekulovski was an independent contractor under the Wage Act.

Nevertheless, we conclude that this potential error does not require reversal. It is well established that we may affirm the result below on any basis that appears in the record, even if it was not the district court's ground for dismissing the suit. *See Bivens v. Trent*, 591 F.3d 555, 559 (7th Cir. 2010); *Stockwell v. City of Harvey*, 597 F.3d 895, 901 n.2 (7th Cir. 2010). As REIS and M&M Chicago argued in their brief, the jury—in its verdicts on other counts—found that Sekulovski was not owed any of the commissions that formed the bases of his claims for wages under the Wage Act. Sekulovski did not address this point in his opening brief, and he failed to develop any argument refuting it in his reply brief. Even if a jury were to determine that Sekulovski had been an "employee" under the Wage Act, Sekulovski could not maintain a claim under the Wage Act because he was not owed any commissions. *Cf. Rakos v. Skytel Corp.*, 954 F. Supp. 1234, 1240 (N.D. Ill. 1996) (noting that a right to wages is a prerequisite to recovery). Accordingly, we will not reverse and order the district court to hold a trial on Sekulovski's Wage Act claims. Any error in refusing to submit the claims to the jury was rendered harmless by the jury's verdicts. *See Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 720 (7th Cir. 2004).

*D. Post-Trial Motions*

After the jury returned verdicts in favor of M&M Chicago on each of its claims and against Sekulovski on his counterclaims, Sekulovski filed two motions seeking to avoid liability. He now contends that the district court erred in denying his Rule 50(b) motion for a judgment as a matter of law on each of M&M Chicago's claims because the jury's verdicts were against the manifest weight of the evidence. He also contends that the district court abused its discretion in denying his Rule 59 motion for a new trial in light of Luttner's alleged post-trial admission of perjury. Neither contention justifies reversal.

*1. Judgment as a Matter of Law*

Sekulovski appeals the denial of his Rule 50(b) motion as to each of the jury's verdicts against him. He contends both that (1) there was insufficient evidence of a fraudulent scheme between himself and Luttner to prove the elements of fraud and to support the jury's verdicts and that (2) any employment contract between him and M&M Chicago would not have incorporated the Policy Manual and thus could not support the jury's verdicts on M&M Chicago's breach of contract, conversion, and tortious interference claims.[5] The district court

---

[5]   In his reply brief, Sekulovski argues for the first time that the commissions forming the basis of M&M Chicago's conversion

(continued...)

found that sufficient evidence of a fraudulent scheme was before the jury, as the evidence showed that Sekulovski's booking statements did not accurately reflect the work he and Luttner actually performed. The district court also found that the parties had always behaved as if the Policy Manual governed their relationship, concluding that the jury had before it sufficient evidence to determine the scope of their implied contract.

We review *de novo* the district court's denial of Sekulovski's Rule 50(b) motion, viewing the evidence available to the jury in the light most favorable to M&M Chicago and drawing all reasonable inferences in its favor. *Waters v. City of Chicago*, 580 F.3d 575, 580 (7th Cir. 2009). Sekulovski presents no arguments on appeal that undermine the district court's compelling reasoning below or that call into question the rationality of the jury's decisions. It borders on absurdity to suggest either that Sekulovski and M&M Chicago did not believe themselves to be in a contractual relationship or that their contract did not incorporate the Policy Manual. Sekulovski's work as an agent for M&M Chicago, in light of their contract and state law governing real estate agents, provided the background for the jury to conclude that the deals he entered into inured to

---

[5] (...continued)
claims would not support those claims because they were general debts and not specific assets. We express no opinion on the merit of this argument, pausing only to note that he waived any argument on this point by delaying it until his reply. *Bodenstab*, 569 F.3d at 658.

M&M Chicago and that he breached his contract with the firm. Because reasonable jurors could have found in M&M Chicago's favor on all counts given the evidence before them, the district court did not err in denying Sekulovski's Rule 50(b) motion. *See Waite v. Bd. of Trs. of Ill. Cmty. Col. Dist. No. 508*, 408 F.3d 339, 343 (7th Cir. 2005).

### 2. New Trial

Finally, Sekulovski appeals the denial of his Rule 59 motion for a new trial based upon both the cumulative effect of the district court's erroneous evidentiary rulings and also a post-trial email allegedly authored by Luttner. His argument distills to three points: (1) that Luttner could not be trusted, and, because the district court would not let him prove that, the verdicts were based upon skewed evidence; (2) that erroneous jury instructions required that the case be retried; and (3) that even if the evidence sufficed to avoid his Rule 50(b) motion, the jury's verdict was nonetheless against the manifest weight of the evidence. We have already held that the district court's jury instructions were not erroneous, so no further discussion is called for on that point.

We review the district court's denial of Sekulovski's Rule 59 motion for a new trial for an abuse of discretion, reversing only if "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010) (internal quotation marks omitted). We have ex-

plained that appellants such as Sekulovski "bear a par-
ticularly heavy burden because a court will set aside a
verdict as contrary to the manifest weight of the evi-
dence only if no rational jury could have rendered the
verdict." *Lewis*, 590 F.3d at 444 (internal quotation
marks omitted). Sekulovski provides no argument sug-
gesting that the members of the jury and the trial judge
were all irrational; he instead centers his appeal on the
contention that they were all mislead by the purported
contract. But as previously noted, the evidence clearly
supported the existence of a contract between Sekulovski
and M&M Chicago. In fact, the irrational position
would be to assume that the parties engaged in so
many transactions without having any ongoing under-
standing of the terms governing their relationship.

Sekulovski's final attempt to pepper the target is the
most dramatic, but it no more warrants reversal than his
other arguments. He contends that Luttner's post-trial
email confirmed Luttner was a lying witness for hire
and that—especially in light of the other credibility evi-
dence the district court excluded—it mandated a new
trial. The email, which M&M Chicago alleges was fabri-
cated by Sekulovski himself, states that REIS was
backing out of its agreement to pay Luttner's legal bills
and that for $200,000 Luttner would "tell everyone the
truth and that [he] lied." Sekulovski argues that his
proffer of this email in conjunction with his Rule 59
motion gave the district court the chance to rectify its
erroneous evidentiary exclusions at trial.

The email, if actually authored by Luttner, would cast
further doubt on Luttner's veracity during his deposi-

tion. But for Sekulovski to succeed on his motion, he needed to show—among other criteria—both that the evidence was not merely cumulative or impeaching and that the email's introduction at a new trial would probably yield a different result. *Envtl. Barrier Co. v. Slurry Sys., Inc.*, 540 F.3d 598, 608 (7th Cir. 2008). Sekulovski demonstrated neither the admissibility nor the proper grounds for consideration of the email.

At the outset, we note that the alleged confession is hearsay, and Sekulovski offers no argument in his opening brief identifying any exception making it admissible.[6] The district court also correctly noted that Sekulovski offered the purported email merely to impeach Luttner, which is not a ground for the consideration of the new evidence. In addition, Luttner's credibility had already been called into question throughout the trial. The jury surely harbored no doubts about Luttner's readiness to attack Sekulovski, especially after seeing two of Luttner's expletive-laced, hateful emails allowed into evidence. Any further arguments to the jury regarding Luttner's credibility would have been cumulative. Finally, Sekulovski presents no arguments to refute the district court's convincing reasoning that a new jury would render the same verdicts even if armed with the post-trial email.

---

[6] In his reply brief, Sekulovski belatedly suggests—without a developed argument or legal support—that the email constitutes a statement against Luttner's interest and was thus admissible under Fed. R. Evid. 804(3). We express no opinion on this waived argument.

In summary, the jury's verdicts were eminently reasonable in light of the manifest weight of the evidence. Sekulovski did not meet the criteria for securing a new trial based on newly discovered evidence. The district court thus did not abuse its discretion by denying Sekulovski's Rule 59 motion for a new trial.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's entry of judgment as a matter of law in favor of M&M Chicago on Sekulovski's Wage Act claims, its entry of judgment on the jury's verdicts as to all other claims, and its denial of Sekulovski's post-trial motions.