In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 22-2664 & 22-2675

BRAD MARTIN,

*Plaintiff-Appellant,*

*v.*

ACTAVIS PHARMA, INC.;
ACTAVIS LABORATORIES UT, INC.;
and ACTAVIS, INC.,

*Defendants-Appellees.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-04292 — **Matthew F. Kennelly**, *Judge.*

ARGUED APRIL 6, 2023 — DECIDED JUNE 20, 2023

Before FLAUM, ST. EVE, and PRYOR, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Plaintiff Brad Martin was taking a testosterone replacement therapy drug ("TRT") called Androderm when he suffered a heart attack. That made him one of hundreds of claimants who took a TRT before experiencing a significant cardiac event. The resulting lawsuits against TRT-producing pharmaceutical companies were consolidated as a

multidistrict litigation ("MDL"), and Martin filed his lawsuit as part of that MDL. When defendant Actavis,[1] the company that produces Androderm, reached a global settlement with most of the MDL plaintiffs, Martin opted to take his case to trial instead.

Ultimately, this was the wrong choice for Martin. After a nine-day trial, it took the jury just thirty minutes of deliberation to decide that Androderm had not caused his heart attack. Hours later, Martin's attorney, James O'Brien, received the last documents in a months-overdue discovery production for another Androderm case in the MDL on which he was also lead counsel. These documents included a previously undisclosed letter from the Food and Drug Administration ("FDA") requiring Actavis to conduct a trial to study a potential causal link between Androderm and high blood pressure. Armed with that letter, Martin's attorney filed a motion for a new trial, alleging that Actavis had intentionally withheld evidence to protect its defense strategy against Martin. The district court denied the motion, holding that because Actavis was not required to disclose the letter and Martin had failed to request it, the evidence did not warrant a new trial. Because the FDA letter would probably not have resulted in a verdict in Martin's favor, we now affirm.

## I. Background

In late 2012, Brad Martin was dealing with fatigue, loss of energy, and low libido. In response, his doctor recommended TRT treatment. The doctor prescribed Androderm, which

---

[1] The appellees here are actually three companies: Actavis Pharma, Inc.; Actavis Laboratories UT, Inc.; and Actavis, Inc., all of which produce Androderm in some capacity. We refer to them collectively as "Actavis."

Martin took for seven months before suffering a heart attack in May 2013. Thankfully, he survived, but the attack damaged his heart and left him anxious about the potential for another incident. Martin soon realized he was not alone—hundreds of people had suffered cardiac events while taking TRTs and had filed lawsuits in federal court. The Judicial Panel on Multidistrict Litigation consolidated those cases into an MDL in the Northern District of Illinois before Judge Kennelly. In 2015, Martin filed his complaint against Actavis as part of that MDL.

Actavis later entered into a global settlement agreement, resolving roughly 600 Androderm lawsuits in the MDL. Martin opted out of that settlement, as did the co-plaintiffs in another suit, Douglas and Laura Davis. The two cases proceeded with the same attorney, James O'Brien.

In January 2021, Douglas Davis (through O'Brien) made discovery requests in his case. Actavis initially refused these requests, but the district court ordered production of the responsive documents no later than June 22, 2021. Actavis immediately produced just over 7,000 documents to Davis. But less than a month later, on July 12, 2021, Actavis sent its counsel an additional 101 responsive pages, which Actavis's counsel accessed that same day. These last 101 pages included the letter from the FDA requiring Actavis to conduct a clinical trial "to assess whether Androderm increases [blood pressure] in hypogonadal men." Actavis's counsel prepared these documents for production on August 10, 2021, but did not produce them for another month.

Meanwhile, Martin's jury trial had begun. Martin presented evidence from three clinical trials that indicated a link between TRTs and heart attacks. The theory of Martin's case

was simple: his prescription Androderm, which did not have a warning label about potential cardiac events, caused his heart attack. Actavis argued that Martin's poor health, not Androderm, caused his heart attack. Actavis's defense focused on eight aspects of Martin's health that constituted risk factors for heart attacks: (1) high blood pressure, (2) high cholesterol, (3) smoking, (4) overweight BMI, (5) pre-diabetes, (6) family history of cardiovascular disease, (7) restless leg syndrome, and (8) sleep apnea. The timing here is important: Martin's trial started on August 5, 2021, nearly one month after Actavis's counsel received the FDA letter requiring further investigation into a possible link between Androderm and high blood pressure. Nevertheless, Actavis argued at trial that Martin's high blood pressure was one of the eight possible causes of his heart attack. At no point during the trial did Actavis give Martin the FDA letter.

Martin's trial ended on August 17, 2021, with a verdict in Actavis's favor. But just a few hours after the verdict, Actavis tendered the remaining 101 pages of discovery in the Davis case—the documents including the FDA letter—to O'Brien.

O'Brien then filed a motion for a new trial under Federal Rule of Civil Procedure 59(e), contending that Actavis intentionally hid the FDA-ordered study in the Davis case until Martin's trial was complete. O'Brien argued that the FDA letter was new evidence that undermined the jury verdict.[2] The district court rejected this argument, holding that none of the discovery orders in the Martin case covered the FDA letter.

---

[2] O'Brien also argued that the district court manifestly erred when it allowed Actavis to admit the warning label from another of Martin's medications. He has abandoned that argument on appeal.

Because there was no obligation on Actavis's part to disclose the material in the first place, and because there was ample information available to Martin and his attorney to put them on notice about the existence of the FDA letter, the district court denied the motion for a new trial. This appeal followed.

## II. Analysis

"Relief under Rule 59(e) is an 'extraordinary remedy reserved for the exceptional case.'" *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 463 (7th Cir. 2021) (internal alteration omitted) (quoting *Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015)).

> To succeed on a motion under Rule 59, a party must show that: (1) it has evidence that was discovered post-trial; (2) it had exercised due diligence to discover the new evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that a new trial would probably produce a new result.

*Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 955 (7th Cir. 2013).

We think this case is easily decided on the final factor[3]: likelihood of a different result. Martin fails to show that, in

---

[3] The district court denied the motion on the second factor, due diligence, but "[w]e may affirm the district court judgment 'on any ground supported in the record, so long as that ground was adequately addressed in the district court and the nonmoving party had an opportunity to contest the issue.'" *Oneida Nation v. Village of Hobart*, 968 F.3d 664, 686 (7th Cir. 2020) (quoting *Am. Homeland Title Agency, Inc. v. Robertson,* 930 F.3d 806, 810 (7th Cir. 2019)). This means that "the issue was raised and the non-moving party had a fair opportunity to contest [it] in the district court." *Locke v. Haessig*, 788 F.3d 662, 666 (7th Cir. 2015). The parties properly

light of the new evidence he points to, the jury would prob-
ably—not just possibly—have found in his favor. *Id.*; *Matter of
Chi., Milwaukee, St. Paul & Pac. R. Co.*, 78 F.3d 285, 294 (7th Cir.
1996).

**A. Considerations for the Prejudice Prong**

There is no rigid test for determining when newly discov-
ered evidence is significant enough that, had it been pre-
sented at trial, the jury's decision would have been different.
But our caselaw reveals at least two relevant factors to the
probability analysis in this case: (1) the weight of the evidence
the plaintiff seeks to undermine, and (2) whether evidence al-
ready presented at trial served the same purpose as the new
evidence on which the plaintiff relies.

Our opinion in *Jones v. Lincoln Electric Co.*, 188 F.3d 709 (7th
Cir. 1999), reflects the need to weigh the evidence presented
at trial in determining whether a new trial is warranted. In
*Jones*, we affirmed the denial of a motion for a new trial based
on later-discovered evidence that would allegedly have dis-
proven a defense expert's trial testimony. We found it un-
likely that the new evidence would have led to a different re-
sult in part because the plaintiff had already discredited the
expert on cross-examination. *Id.* at 726. The plaintiff also had
offered his own expert who had "undercut the weight" of the
allegedly false testimony through his own research. *Id.* at 726,
735. Accordingly, *Jones* supports that where the trial evidence

---

briefed the fifth prong of the Rule 59(e) analysis, probability of a different
result, both before the district court and on appeal. Accordingly, we pro-
ceed directly to this final factor.

has already been effectively discredited, the new evidence undermining it is unlikely to alter the outcome of the trial.

We have also considered whether other evidence that was admitted at trial served essentially the same purpose as the new evidence would. In *Marcus & Millichap Investment Services of Chicago, Inc. v. Sekulovski*, 639 F.3d 301 (7th Cir. 2011), we affirmed the district court's refusal to grant a new trial based on a post-trial email from one of the witnesses. The defendant insisted the email would have so successfully impeached the witness in front of the jury that a new trial was warranted. *Id.* at 314. But we affirmed the finding that this did not make a new outcome probable, because that witness's credibility had already "been called into question throughout the trial," *id.*, and "[t]he jury surely harbored no doubts about [the witness's] readiness to attack" the defendant. *Id.* Because the email would just have been more of the same, it did not warrant a new trial.

## B. The FDA Letter Does Not Make a New Outcome Probable

We now apply this framework to the FDA letter and Martin's trial.

Martin argues that the FDA letter would probably have led the jury to decide in his favor. As he recalls the trial, Actavis premised nearly all of its defense on the argument that his high blood pressure, and not Androderm, caused his heart attack. If the jury had believed that Androderm could have caused the high blood pressure, then Martin maintains it would certainly have reached a different conclusion. But he is both wrong about the focus of the trial and wrong about the likely impact of the FDA letter. Accordingly, he fails to meet

the high bar of a *probability* that this evidence would have altered the outcome of his trial.

First, like the expert testimony in *Jones*, the blood pressure evidence that the FDA letter would undermine was not very important to Martin's trial. A thorough review of the record reveals that high blood pressure was not the crux of Actavis's defense. To be sure, the record of the nine-day trial is replete with references to Martin's uncontrolled high blood pressure as a potential cause of his heart attack. But Actavis did not focus on high blood pressure alone—it mentioned high blood pressure as one of *eight* potential causes of Martin's heart attack besides Androderm, all of which received significant attention during the trial. Each time Actavis referenced high blood pressure, it raised at least one other risk factor; and Actavis emphasized that any risk factor, standing alone, was sufficient to cause a heart attack.[4] In fact, it was only when Martin presented blood-pressure-specific evidence or testimony that the defense mentioned high blood pressure as a standalone risk factor in rebuttal.

Even if the high blood pressure evidence had been more important to the trial, the considerations highlighted in *Marcus* make clear that the FDA study would not have made a new outcome probable. Martin's attorney had already undercut the significance of Martin's high blood pressure at trial. His attorney, for example, had cross-examined defense witnesses on Martin's high blood pressure and whether it was

---

[4] As noted above, these risk factors were: (1) high blood pressure, (2) high cholesterol, (3) smoking, (4) overweight BMI, (5) pre-diabetes, (6) family history of cardiovascular disease, (7) restless leg syndrome, and (8) sleep apnea.

actually under control. *See Marcus*, 639 F.3d at 314; *see also Jones*, 188 F.3d at 735. And Martin's own expert testified extensively about Martin's high blood pressure, suggesting that it was not as serious as Actavis claimed. In his medical opinion, Martin's blood pressure was "reasonably controlled," and Martin's numbers showed there was "[no]thing … to indicate that he was in hypertension crisis." Because Martin had already undermined the evidence that his high blood pressure had caused his heart attack, it is less likely that a study investigating a possible link between Androderm and high blood pressure would have altered the jury's decision. Like in *Marcus*, the FDA letter would have been, at best, more of the same.

Ultimately, removing Actavis's blood pressure argument would leave seven alternative causes for Martin's heart attack. And the significance of Martin's blood pressure had already been undercut throughout trial. Taken together, the introduction of the FDA letter simply would not make a different outcome probable.

The holding of the district court is

AFFIRMED.